Troy Anthony TUNSTULL, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2009–SC–000170–MR.

Supreme Court of Kentucky.

April 21, 2011.

Daniel T. Goyette, Louisville Metro Public Defender, Elizabeth B. McMahon, Assistant Public Defender, Office of the Louisville Metro Public Defender, Louisville, KY, for appellant.

Jack Conway, Attorney General, Jason Bradley Moore, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, for appellee.

Opinion of the Court by Justice SCHRODER.

Troy Anthony Tunstull appeals as a matter of right from his conviction of four counts of second-degree robbery and being a first-degree persistent felony offender, for which he was sentenced to a total of twenty years' imprisonment. Appellant raises as error the trial court's 1) denying his motion for directed verdict as to second-degree robbery; 2) failing to give instructions on theft by unlawful taking and facilitation to robbery; 3) ruling that he failed to make a prima facie showing of purposeful discrimination in the Commonwealth's use of a peremptory challenge; 4) failing to strike three jurors for cause; 5) denying his motion for funds to hire an expert; 6) permitting the Commonwealth to introduce evidence of out-of-court identifications where he was not provided the

opportunity to cross-examine the witnesses; and 7) refusing to grant a mistrial when a detective's testimony revealed he had a prior criminal record. We affirm.

In a jury trial which commenced on September 29, 2008, Appellant was tried on five counts of first-degree robbery in connection with five bank robberies which occurred in the Louisville area between April 2006 and October 2006.[1] The first incident occurred on April 17, 2006, at the PNC Bank at 3343 Newburg Road. Bank tellers Stephanie Lafon and Donna Magee testified that a man wearing a ski mask and "covered from head to toe" ran into the bank and jumped up on the counter with a blue pillow case in his hand. Lafon testified that the man said, "You all know what time it is." Magee recalled the man saying, "You know what I'm here for. You know what I want." The man grabbed Lafon's hand and had her hold open the pillow case and put money in it. When the man turned, Magee placed bait money in the bag. The man then left out the front door. Lafon had seen the man arrive in a four-door silver car and get out of the passenger side.

The second incident took place on May 1, 2006, at the Fifth Third Bank at 5393 New Cut Road. Four witnesses (two bank tellers, the branch manager, and a customer) testified as to the event. According to these witnesses, two men rushed into the bank, disguised with wigs, baggy clothes, sunglasses, and gloves, and announced, "You know what time it is." One of the men jumped over the counter, and took money out of the tellers' drawers and put it in a bag. The other man stood near the door with his hand in his pocket and repeatedly yelled "Time!", in an effort to encourage the other man to hurry. The men left the building quickly with the bag of money.

The third incident took place on June 29, 2006, at Central Bank, located at 4640 Taylorsville Road. Bank tellers Lauren Armstrong and Daniel Spencer testified as follows. Shortly after 10:00 a.m., a dark red or maroon, four-door, older model car without a license plate backed up to the bank. Armstrong testified that a man exited the car on the passenger side and pulled a mask over his face. The man ran into the bank yelling, "Give it up! Give it up!" Spencer testified the man was wearing a solid white t-shirt, black baggy pants, and a black hat, and had a black and white bandana tied around his face. Armstrong threw money on the counter, and the man grabbed it. The man then ran out and got into the passenger side of the car. Spencer believed it was the same man he had seen running across the parking lot approximately twenty minutes earlier. Spencer told police that the man resembled a bank customer named Robert Harp. Spencer later identified a Chevy Caprice in a nearby apartment complex parking lot as the car he had seen at the bank. The Louisville Metro Police Department determined that the car belonged to a Laverne Westin.[2]

The fourth incident occurred on August 11, 2006, at the National City Bank at 5610 South Third Street. The Commonwealth presented testimony from seven witnesses (four bank tellers, the bank manager, and two customers). According to these wit-

---

1. Four counts under Indictment No. 07–CR–00700, joined with one count under Indictment No. 07–CR–01273. Indictment No. 07–CR–01273 also charged Appellant with two additional counts of first-degree robbery in connection with two 1998 robberies, which were severed for purposes of trial and are not at issue in this case.

2. In his confession and trial testimony, Appellant acknowledged that he knew Laverne Westin.

nesses, an African–American man entered the bank, pointed a gun at the tellers behind the counter, and demanded money. The man was wearing sunglasses, a black baseball cap, a long-sleeve jacket, black shorts, and tennis shoes. As the tellers placed the money on the counter, the man put it in a bag and then ran out the side door.

The fifth incident took place at the same branch of National City Bank on October 23, 2006. The same four tellers and bank manager who had been present during the August 11, 2006 robbery were again present. These five witnesses, along with an additional bank teller and a customer, testified as to what occurred. According to these witnesses, an African–American man entered the bank through the side door and demanded money in a loud, aggressive voice. The bank employees/witnesses who had witnessed the August robbery believed he sounded like the same man that had committed that robbery. However, this time, no one saw a gun. The man wore dark clothing, a black baseball cap, and white gloves, and had an unshaven face. The tellers handed the man money, which he put in a bag. When the man left, one teller followed and saw a red Chevrolet Cobalt, with the man inside, driving off quickly. The bank manager was able to read the license plate number, which was given to the police.

Police learned that the Cobalt had been leased by Enterprise Rent–A–Car to Sharonda Sloss. The car was located that night in the parking lot of the Fern Creek Wal–Mart, where Sloss was employed. Police followed Sloss when she left work that evening and pulled her over. Sloss was taken to the police station for questioning, and her car was processed for evidence. Fingerprints matching Demond Tunstull, Appellant's cousin, were found on the car. None of the fingerprints matched Appellant's. At the police station, Sloss allegedly told Detective Larry Duncan that Appellant and Demond had taken the car around 1:00 p.m. while she was at a health-care clinic, and had used it to commit the robbery.[3] Sloss was in a relationship with Appellant at the time, whom she knew by the name Naim Abdul Jalil. Sloss also allegedly identified Appellant in still photographs made from the National City Bank surveillance video.

A search warrant was executed at Sloss's apartment on October 24, 2006. Police retrieved a Kentucky driver's license for Naim Abdul Jalil, a Halloween mask, packaging from two Halloween masks, a black hooded jacket, and a black nylon insulated bag. No cash or guns were found in the apartment.

FBI agents arrested Appellant at Sloss's apartment on February 12, 2007, and transported him to the United States Marshal's Office for questioning. Appellant initially denied any knowledge of the robberies, but, after being shown the bank surveillance photos and told that Sloss's car had been used in a robbery, subsequently admitted to them all. This initial interrogation, which lasted a little over two hours, was not recorded. Appellant was then transported to the Louisville Metro Police Department (LMPD) headquarters where a taped statement was taken. Therein, Appellant admitted that he had committed the crimes at issue. This taped confession was played for the jury at trial.

Appellant testified in his own defense and denied committing the robberies. He

---

**3.** At trial, Sloss denied making this statement, which was subsequently introduced through the testimony of Detective Duncan pursuant to KRE 801A(a)(1). To the contrary, Sloss testified that she had never loaned her car to Appellant or Demond, nor had they taken it without her permission.

testified that he falsely confessed to the crimes to satisfy the police, in order to protect his family. Appellant testified that he suspected that his cousin Demond Tunstull was involved after he (Appellant) was arrested and the police informed him that Sloss's car had been used in a robbery. Appellant testified that he had loaned the car to Demond on October 23, 2006, and that Demond had acted nervous when he returned the car and had advised Appellant not to use it because it was "hot". Appellant testified that he felt that he should protect Demond, with whom he had been raised and whom he loved like a brother. Appellant testified that people would often mistake them for brothers and call them twins because they looked so much alike.[4] Appellant testified that the law enforcement officials who conducted his interrogation told him that they would arrest Demond, Sloss (his girlfriend), his mother, and his brother, if he did not claim responsibility for the robberies. Appellant explained that in his confession he was repeating and agreeing with details the police gave him about the robberies, and, in order to protect his family, that he added in his own details to convince the police that he had done the robberies. Appellant testified that he was now telling the truth, because, although he still loved Demond, he felt like Demond had abandoned him and left him in the lurch.

The trial court granted Appellant's motion for directed verdict as to first-degree robbery for four of the five counts (the exception being the August 11, 2006, National City robbery where a gun was shown), finding the evidence insufficient to establish first-degree robbery, but sufficient to support second-degree robbery. The trial court rejected Appellant's re-

quest for theft by unlawful taking instructions on all the counts, and rejected Appellant's request for facilitation instructions, with the exception of one count. The jury was ultimately instructed on second-degree robbery/complicity as to the April 17, 2006 (PNC Bank), May 1, 2006 (Fifth–Third Bank), and June 29, 2006 (Central Bank) incidents; first- and second-degree robbery as to the August 11, 2006 (National City Bank) incident; and second-degree robbery/complicity and facilitation to second-degree robbery as to the October 23, 2006 (National City Bank) incident.

The jury found Appellant guilty of second-degree robbery as to the April 17, 2006, May 1, 2006, June 29, 2006, and October 23, 2006 incidents. The jury acquitted Appellant of any charges relating to the August 11, 2006 (National City Bank) incident. The jury subsequently found Appellant guilty of being a first-degree persistent felony offender. Appellant was ultimately sentenced to a total of twenty years' imprisonment. Appellant appeals to this Court as a matter of right, alleging a number of trial errors.

## SUFFICIENCY OF THE EVIDENCE AS TO SECOND–DEGREE ROBBERY

Appellant first argues that the trial court erred in denying his motion for directed verdict as to second-degree robbery. Appellant moved for a directed verdict on all counts as to both first- and second-degree robbery. The trial court granted Appellant's motion as to first-degree robbery (with the exception of the August 11, 2006 robbery), but denied the motion as to second-degree robbery.

---

4. A photograph of Demond Tunstull was introduced into evidence through another defense witness.

■ KRS 515.030(1) provides that "[a] person is guilty of robbery in the second degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft." On appeal, Appellant contends that the evidence was insufficient to convict him of second-degree robbery, in that there was no evidence that he used or threatened the use of physical force. We disagree. An individual, particularly when masked or otherwise disguised, coming into a bank aggressively demanding money is a threat in and of itself—the implication clearly being that if the employees or customers do not comply, that physical force will follow. *See Lawless v. Commonwealth,* 323 S.W.3d 676 (Ky.2010). Accordingly, the trial court did not err in denying Appellant's motion for directed verdict as to second-degree robbery with respect to any of the counts in this case.

### FAILURE TO GIVE INSTRUCTIONS ON THEFT BY UNLAWFUL TAKING AND FACILITATION TO ROBBERY

■ Appellant next argues that the trial court erred in denying his request for instructions on theft by unlawful taking over $300 on each count as a lesser included offense of second-degree robbery. A trial court's rulings on instructions are reviewed under an abuse of discretion standard. *Ratliff v. Commonwealth,* 194 S.W.3d 258, 274 (Ky.2006). An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense and, yet, believe beyond a reasonable doubt that he is guilty of the lesser offense. *Houston v. Common-*

*wealth,* 975 S.W.2d 925, 929 (Ky.1998). The trial court has no duty to instruct on a theory not supported by the evidence. *Payne v. Commonwealth,* 656 S.W.2d 719, 721 (Ky.1983).

■ The evidence does not support the giving of a theft instruction as to any of the counts. Second-degree robbery requires that a person "uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft." KRS 515.030(1). Theft by unlawful taking requires only "control over movable property of another with intent to deprive him thereof." KRS 514.030(1)(a). Theft is generally considered a crime against property, whereas robbery is considered a crime against a person. *Morgan v. Commonwealth,* 730 S.W.2d 935, 937–38 (Ky.1987).

■ Appellant argues that a juror could have reasonably believed that he took the money from the banks but that he used no physical force or threat of physical force, and therefore that theft instructions were warranted. We disagree. A threat does not have to be actual words, but can be communicated by conduct or a combination thereof. *Lawless,* 323 S.W.3d 676. As recognized previously, a person rushing into a bank, wearing a ski mask or otherwise disguised, and aggressively demanding money, carries with it an implied threat of physical force against the person(s) from whom the money is demanded if they do not comply. It is uncontroverted that all of the incidents at issue herein involved such facts.[5] In light of this evidence, we believe no reasonable juror could conclude, as to any of the incidents, that Appellant was not guilty of second-degree robbery, yet guilty of theft. *See id.* (theft instructions not warranted where

---

5. Had, for example, Appellant simply come into the bank, swiped money off of the counter and run, a theft instruction may have been warranted.

robber kept hand in her pocket, but did not make any verbal threats).[6]

■ Appellant further argues that the trial court erred in denying his request that the jury be instructed on facilitation to second-degree robbery on all the counts, on grounds that, based upon the evidence, the jury could have believed that Appellant was an indifferent getaway driver, or that he merely loaned Laverne Westin's car and Sharonda Sloss's car to his cousin Demond, which Demond then used to commit the robberies. The trial court granted Appellant's request for a facilitation instruction as to the October 23, 2006 (National City Bank) incident based on Appellant's testimony that he had loaned Sloss's car to Demond. The trial court denied the request as to the other counts, finding the evidence insufficient to support a facilitation theory.

■ KRS 506.080(1) provides:

A person is guilty of criminal facilitation, when, acting with knowledge that another person is committing or intends to commit a crime, he engages in conduct which knowingly provides such person with means or opportunity for the commission of the crime and which in fact aids such person to commit the crime.

"Facilitation reflects the mental state of one who is 'wholly indifferent' to the actual completion of the crime." *Perdue v. Commonwealth*, 916 S.W.2d 148, 160 (Ky.1995). There was no evidence in this case to support a reasonable inference that Appellant was "wholly indifferent" to the completion of the April 17, 2006, May 1, 2006, and June 29, 2006 robberies.[7] *Id.; Dixon v. Commonwealth*, 263 S.W.3d 583, 587 (Ky.2008). Rather, the evidence as to these counts supported either the theory that Appellant was an active participant in these robberies (whether as the robber or as a getaway driver), or, if the jury chose to believe Appellant's trial testimony, that Appellant was not involved whatsoever. *See White v. Commonwealth*, 178 S.W.3d 470, 490–91 (Ky.2005). We further agree with the trial court that the evidence did not support a finding that Appellant was an "indifferent" getaway driver, in light of the fact that the getaway driver in this case (whoever it was), dropped off, and waited for, the individual who robbed the bank. Accordingly, the trial court did not err in denying Appellant's request for a facilitation instruction as to the remaining counts.

## FAILURE TO MAKE PRIMA FACIE SHOWING OF PURPOSEFUL DISCRIMINATION IN THE COMMONWEALTH'S USE OF A PEREMPTORY CHALLENGE

■ Appellant next argues that the trial court erred in concluding that he had not made a prima facie showing of purposeful discrimination in the Commonwealth's use of a peremptory strike against an African–American juror. Following voir dire, the Commonwealth used peremptory strikes against two African–American jurors. Appellant did not object to one of the strikes (a juror whom the Commonwealth had attempted to remove for cause based on her response to a question on voir dire), but did object as to Juror No. 219296, on grounds that this juror had said nothing during voir dire.

---

6. While *Swain v. Commonwealth*, 887 S.W.2d 346, 348 (Ky.1994), concluded theft instructions were warranted under similar facts, albeit involving a convenience store, the case appears to be an anomaly and is limited to its own facts.

7. The issue is moot as to the August 11, 2006 robbery, of which Appellant was acquitted of any charges.

Pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Appellant requested the Commonwealth provide its reason for using a peremptory strike against this juror. The trial court found that Appellant had not made a prima facie showing because the Commonwealth had used peremptory strikes against only two of the possible five African–American jurors.[8] As such, the trial court found the Commonwealth was not required to articulate its reason for striking Juror No. 219296. The trial court did order the Commonwealth, for avowal purposes, to submit a written reason under seal.[9]

■ In *Batson*, the United States Supreme Court set forth a three-part test for determining whether a state's use of peremptory challenges violates the Equal Protection Clause:

> A defendant first has the burden of making a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if this showing is made, then the burden shifts to the prosecutor to articulate a race-neutral reason for striking the juror in question; and third, the trial court must then determine whether the burden of proving purposeful discrimination has been met.

*Chestnut v. Commonwealth*, 250 S.W.3d 288, 300–01 (Ky.2008) (citing *Batson*, 476 U.S. at 96–98, 106 S.Ct. 1712). To establish a prima facie case of discrimination based on race, the opponent of the challenge must show that: 1) he is a member of a cognizable racial group; 2) peremptory challenges are being exercised to re-

move from the venire persons of the defendant's race; and 3) the circumstances raise an inference that the exclusion was based on race. *Batson*, 476 U.S. at 96, 106 S.Ct. 1712.

■ "Because the trial court is the best 'judge' of the Commonwealth's motives in exercising its peremptory strikes, great deference is given to the court's ruling." *Gray v. Commonwealth*, 203 S.W.3d 679, 691 (Ky.2006) (citing *Wells v. Commonwealth*, 892 S.W.2d 299, 303 (Ky.1995)). On appellate review, a trial court's denial of a *Batson* challenge will not be reversed unless clearly erroneous. *Chestnut*, 250 S.W.3d at 302 (citing *Hernandez v. New York*, 500 U.S. 352, 369, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) and *Washington v. Commonwealth*, 34 S.W.3d 376, 379–80 (Ky.2000)).

In the present case, Appellant meets the first prong of the test because he is African–American. With regard to the second prong, there were five African–American jurors, of whom the Commonwealth struck two (one of which strikes Appellant did not object to), leaving three African–American individuals on the jury panel. Based on numbers alone, the trial court found that a prima facie case had not been made. Without more, we cannot say that the trial court clearly erred in its ruling. *Chestnut*, 250 S.W.3d at 300–02. *Cf. Washington v. Commonwealth*, 34 S.W.3d 376 (Ky.2000) (prima facie showing made where Commonwealth used peremptory strike against only remaining African–American juror, to whom no questions had been directed on voir dire).

---

**8.** The Commonwealth further argued that it would not have used a peremptory strike against a sixth African–American juror who had been removed by random draw prior to the exercise of peremptory challenges.

**9.** Per the parties' briefs, the Commonwealth inadvertently neglected to write down the reason. Appellant does not allege bad faith on the part of the Commonwealth for its failure to do so.

## DENIAL OF MOTIONS TO STRIKE THREE JURORS FOR CAUSE

Appellant argues that the trial court erred in failing to strike Juror Nos. 227428, 200949, and 195639 for cause. During voir dire, the prosecutor asked if any juror had been a witness to a crime. Juror No. 227428 asked to approach the bench and explained that he had been mugged by two men, four or five years ago, while he was outside walking. One of the men hit him in the face, knocking him to the ground, and causing him to lose two teeth. The juror noted the men were on a rampage that resulted in a total of fifteen victims, but that they were caught, pled guilty, and were serving thirty-year sentences. When the trial court asked if this meant that he would be a good juror for the Commonwealth—because he had been victimized himself, wouldn't stand for it anymore and would want the defendant to "go down" for whatever it was said that he did—the juror responded "no", explaining that he was a high school teacher and that he had a group of twenty students he dealt with daily who were probably on their way to the judicial system. When the court asked if the experience would color his ability to be fair, the juror stated, "I don't think it will," and further agreed that he believed in the presumption of innocence, would require the Commonwealth to prove its case beyond a reasonable doubt, and could consider the entire penalty range.

Later, during Appellant's voir dire, defense counsel reminded the jury that Appellant was charged with five separate bank robberies and posed the following question: "I want to ask you if that information alone makes it more likely to you that Troy Tunstull is guilty of those robberies than a person who is just charged with one robbery?" Juror No. 203006 stated that he was "more inclined to think yes" because of the frequency. He then clarified that it does not mean he is guilty but makes it more likely. When defense counsel asked if any other jurors felt the same way, Juror No. 204968 raised his hand and agreed that the statistics made it hard to get it wrong five times. Juror No. 200949 then nodded her head in agreement and stated that it may be a mistake if you are in the wrong place at the wrong time once but that it "makes you question" when it is repeated over and over again. Juror No. 195639 agreed with these jurors, commenting that it "sounds like a pattern" and that it made it likely he committed the crimes but maybe not.

Appellant moved to strike Juror Nos. 227428, 203006, 204968, 200949, and 195639 for cause. As to No. 227428, the high school teacher, Appellant argued that his tone and commentary concerning his students indicated that he prejudges which people will end up in the judicial system.[10] The trial court denied the motion, finding that this reason did not rise to the level of cause. As to Juror Nos. 203006, 204968, 200949, and 195639, Appellant argued that these jurors believed that a person charged with multiple offenses was more likely to be guilty. The trial court denied the motions, finding that these jurors' answers were fair commentary and reasonable explanations with regard to the question posed. Juror No. 203006 was removed from the venire for other reasons, and Juror No. 204968 was subsequently removed by random draw. Appellant used peremptory strikes against Juror Nos. 227428, 200949 and 195639.

10. The defense argued for removal of this juror on other grounds as well, which grounds Appellant does not argue on appeal.

■ On appeal, Appellant contends that the trial court abused its discretion by failing to excuse Juror Nos. 227428, 200949, and 195639 for cause. The trial court is required to excuse a juror if there is a reasonable basis to believe the juror cannot be fair and impartial. RCr 9.36(1). Whether a juror possesses a " 'mental attitude of appropriate indifference' must be reviewed in the totality of the circumstances." *Montgomery v. Commonwealth*, 819 S.W.2d 713, 718 (Ky.1991) (quoting *United States v. Wood*, 299 U.S. 123, 145–46, 57 S.Ct. 177, 81 L.Ed. 78 (1936)). A trial court's decision whether to excuse a juror for cause is reviewed for abuse of discretion. *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky.2007).

Having reviewed the video record, we see no abuse of discretion as to the trial court's failure to strike any of these jurors for cause. The tone of Juror No. 227428 towards his students was not one of "prejudging" people, but was sympathetic in nature, more saddened by what he believed would be these students' futures. As to Juror No. 200949 and Juror No. 195639, we agree with the trial court that their answers were reasonable responses to the question posed by defense counsel, and did not indicate that they could not be fair or impartial. No abuse of discretion occurred.

### DENIAL OF MOTION FOR FUNDS TO HIRE EXPERT ON FALSE CONFESSIONS

■ On February 20, 2008, Appellant filed a motion requesting funds to hire an expert on the psychology of false or wrongful confessions. The defense theory of the case was that Appellant falsely confessed in order to cover for his cousin Demond Tunstull, whom he loved like a brother. An *ex parte* hearing on the matter was conducted on March 5, 2008. On March 10, 2008, the trial court entered an order denying the motion, finding that the employment of a false confessions expert was not reasonably necessary under the circumstances presented. Appellant renewed his motion for funds on the first morning of trial, following the Commonwealth's turning over last minute discovery indicating that only Demond's fingerprints were found on the car (Sloss's rental car) used in the October 23, 2006, National City robbery. The trial court again denied the motion. The court explained that lying to cover for another person was not a false confession of the type for which expert testimony was necessary, as opposed to the types of situations where it is alleged, for example, that police used interrogation techniques which overcame a person's free will or made him believe that he did something he did not do. The court explained that it is the latter type situations that cause great concern to the court and give rise to the need for an expert. In this case, however, the allegation was that Appellant made a conscious decision to falsely confess, in order to protect his cousin. The trial court did not believe that an expert was necessary to explain this concept to the jury.

■ On appeal, Appellant contends that the trial court abused its discretion in denying the motion for funds. In determining whether an indigent defendant is entitled to funding for an expert witness under KRS 31.110(1)(b), a trial court must consider "1) whether the request has been pleaded with requisite specificity; and 2) whether funding for the particularized assistance is 'reasonably necessary'; 3) while weighing relevant due process considerations." *Benjamin v. Commonwealth*, 266 S.W.3d 775, 789 (Ky.2008). A trial court's denial of a request for funds is reviewed for abuse of discretion. *Id.* (citing *Davenport v. Commonwealth*, 177 S.W.3d 763, 773 (Ky.2005), and *Dillingham v. Commonwealth*, 995 S.W.2d 377, 381 (Ky. 1999)).

In this case, we cannot say the trial court abused its discretion in denying funds for an expert. Appellant testified that he falsely confessed to cover for his cousin Demond, whom he loved like a brother and wanted to protect. Appellant further testified that the police had also threatened to arrest his mother, brother, and girlfriend (Sloss) if he did not admit to the crimes.[11] There was no allegation in this case that, for example, Appellant's confession was unreliable due to a mental condition, that his will had been overcome, or that police made him believe he did something he did not do. *See Holloman v. Commonwealth*, 37 S.W.3d 764 (Ky.2001).[12] Appellant's claim was simply that he falsely confessed to protect others. We agree with the trial court that the jury was fully equipped to evaluate Appellant's claim, and that there was no reasonable necessity for an expert. In his testimony, Appellant intelligently and clearly articulated his reasons for making what he claimed was a false confession. In fact, it is clear that the jury believed Appellant's testimony in part, finding him not guilty of one of the robberies he confessed to.[13] No abuse of discretion occurred.

### EVIDENCE OF OUT–OF–COURT IDENTIFICATIONS

Detective Charles Mann testified for the Commonwealth regarding his investigation of the October 23, 2006, National City Bank robbery. On direct, Mann testified that fingerprints matching Demond Tunstull were found on the vehicle used in the robbery (the Chevy Cobalt rented by Sharonda Sloss). On cross-examination, defense counsel clarified with Detective Mann that no fingerprints matching Appellant's were found on the vehicle. Defense counsel then asked Mann about a call police had received from a woman named Marie Pulford who indicated that she had information concerning the robberies. In response to defense counsel's questions, Mann testified that he met with Pulford and another woman, at the other woman's home. The other woman wanted to remain anonymous because she was in a relationship with Demond Tunstull. Mann testified that he took a statement from Pulford and conducted a consensual search of the anonymous woman's home. Mann went on to testify (in response to defense counsel's questions) that, pursuant to the search, he collected clothing which he believed at the time might have significance as to the robberies, and a letter which indicated Demond Tunstull lived at that (the anonymous woman's) address.

On re-direct, the Commonwealth asked Detective Mann if the anonymous woman was shown a surveillance photo from the

---

11. In their testimony, the FBI agent and two detectives who were present for the interrogation denied having made any such threats.

12. As to the circumstances surrounding the confession, the evidence was that Appellant was arrested at Sharonda Sloss's apartment in the early afternoon of February 12, 2007, and taken to the U.S. Marshal's office in Louisville. The initial interview of Appellant, which was not recorded, began that afternoon, at around 1:45 p.m. and ended at approximately 4:00 p.m. The interview was conducted by an FBI Special Agent and two

LMPD detectives. For approximately the first 50 minutes, Appellant denied involvement in the crimes, but subsequently admitted to them all. Because the Federal Building was closing, Appellant was transported to LMPD Headquarters, where a taped statement was taken from 5:37 p.m. to 6:17 p.m. Appellant was offered food, drinks, and cigarettes, and allowed to use the restroom during the interrogations, and does not allege that he was physically mistreated in any way.

13. The August 11, 2006 robbery.

October 23, 2006, National City Bank robbery. Mann responded that he showed both Pulford and the anonymous woman several surveillance photos. When the Commonwealth began to ask if either woman made an identification, defense counsel objected on hearsay grounds. The trial court sustained the objection, but agreed to allow the prosecutor to rephrase the question. The prosecutor thereafter showed Mann a particular photo, which Mann identified as having come from the October 23, 2006 surveillance video from the National City Bank. The prosecutor elicited from Mann that he had shown the photo to the two women, that he had asked them if they could identify anyone in the photo, that he had asked them to write on the photo if they could identify someone in it, and that there was, indeed, writing on the photo. Detective Mann was not permitted to say what was written on the photo. The Commonwealth moved to admit the photo into evidence. The defense objected on hearsay grounds due to the writing on the photo (which identified Appellant as the person in the photo). The trial court sustained the objection.

The trial court agreed with the Commonwealth, however, that the defense had opened the door (with its questions to Detective Mann designed to show Demond Tunstull was the actual perpetrator) with respect as to the question of why the police pursued Appellant rather than Demond Tunstull. Therefore, the court ruled that to the extent that the Commonwealth could answer this question with Detective Mann, the court would permit the Commonwealth to do this. The Commonwealth then asked Mann if he pursued the investigation further after meeting with the two women. Mann testified, over defense counsel's objection, that after talking to the women, everything pointed to Appellant being the "primary suspect."

On appeal, Appellant contends that implicit in Detective Mann's testimony was the fact that Pulford and the anonymous woman identified him as the man in the bank surveillance video. Neither Pulford nor the anonymous woman testified at trial. Appellant argues that Detective Mann's testimony concerning the identification thereby violated his right to confront and cross-examine witnesses against him.

We agree with Appellant that Detective Mann's testimony clearly implied that the women identified him as the person in the bank surveillance photo. Had the Commonwealth attempted to introduce this identification in its case-in-chief, it would have been inadmissible as a violation of the Confrontation Clause, as neither woman testified at trial. *See Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). However, in this case, the evidence was brought up in rebuttal to the defense's initial use of the existence of, and hearsay statements of, these two women to suggest that Demond Tunstull was the person who committed the robberies, and that the police inexplicably went after the wrong man—Appellant. Accordingly, we cannot say the trial court erred in ruling that the defense opened the door with regard to this witness as to why the police pursued Appellant, rather than Demond. *See Norris v. Commonwealth*, 89 S.W.3d 411, 414–15 (Ky.2002).

Appellant also assigns as error hearsay testimony by Detective Larry Duncan that Sharonda Sloss had identified Appellant in a photo taken from a bank surveillance video. Sharonda Sloss was called as a witness by the Commonwealth. Sloss testified that she rented the Chevy Cobalt (identified as the vehicle used in the October 23, 2006 robbery) to use to get to work because her car was not running. She testified that she had never loaned the

car to Appellant or anyone else, nor had he, or anyone, ever taken it without her permission. She denied having told police in her interview following the October 23, 2006, robbery that Appellant and Demond had taken her car and used it to commit the robbery while she was at a healthcare clinic. Following Sloss's testimony, the prosecutor informed defense counsel and the court that it intended to call Detective Larry Duncan for impeachment purposes, who would testify that Sloss had made the above statement. The prosecution indicated that it further intended to elicit from Detective Duncan that, in the same interview, Sloss had identified Appellant in a photograph made from a bank surveillance video.

Defense counsel objected to the hearsay regarding the alleged identification of Appellant by Sloss, on grounds that the Commonwealth had not asked Sloss during her testimony whether she had identified Appellant in a surveillance photograph, and, hence, had not laid the required foundation for impeachment on that issue pursuant to KRE 801. The trial court overruled the objection, believing that Sloss had been so asked. Duncan subsequently testified that he showed a photograph to Sloss, which was made from the October 23, 2006 National City Bank surveillance video, and that she identified the man in the photograph as Appellant.

On appeal, Appellant contends that this testimony by Duncan was inadmissible under KRE 801A(a)(1) because Sloss had not first been asked about having made the identification during her testimony. We agree. KRE 801A(a)(1) allows admission of a prior inconsistent statement of a witness provided the witness testifies at trial and is examined about the statement, subject to a proper foundation pursuant to KRE 613. KRE 613(a) requires, before the prior inconsistent statement of a witness can be offered, that the witness "must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them."

A review of the record confirms that Sloss was not asked during her testimony if she had identified Appellant in a surveillance photograph, or anything remotely similar thereto. The prosecutor and trial court were simply mistaken in their belief that she had been so asked. Because no foundation was laid, the hearsay was inadmissible under KRE 801A(a)(1). However, in light of the evidence in this case, we conclude the error was harmless. Appellant confessed to all of the robberies. Further, the jury heard evidence by way of the recorded confession, and testimony by a detective who was present for the interview, that Appellant was shown photographs made from the bank surveillance videos, including both National City robberies, and that Appellant confirmed that it was, in fact him, in the photographs. Appellant wrote "this is me" on the photographs, and signed his name. These photographs were shown to the jury, as was the photo from which Sloss allegedly made the identification. In light of the aforementioned evidence, we see no likelihood that the verdict was substantially swayed by the error, and hence deem the error harmless. *Winstead v. Commonwealth*, 283 S.W.3d 678, 688–89 (Ky.2009).

## DENIAL OF MOTION FOR MISTRIAL

Detective Duncan testified that while he was questioning Sloss, a search warrant was being executed at Sloss's apartment. Duncan received a call from the detective conducting the search that a driver's license with the name Naim Abdul Jalil was found in the apartment. Duncan testified that from the presence of the letter "T" in the driver's license number he

was able to tell that the person with the license had changed his name, and then added "In fact, I've know this fellow since 19...." Defense counsel objected and moved for a mistrial, on grounds that there was no way that Duncan could know Appellant other than from his previous experience as a robbery detective. In a bench conference, the prosecutor stated that he did not know the detective was going make such a statement. The trial court denied the motion for a mistrial, and defense counsel declined the trial court's offer of an admonition.

The prosecutor thereafter tried to steer the questioning back to imply that Duncan was able to ascertain Appellant's identity from the driver's license database. When the Commonwealth asked Duncan if he had cross-referenced the number and birthday with the driver's license database to find Appellant's name, Duncan responded that he looked into "a database" and was able to match it. Defense counsel immediately objected and moved again for a mistrial. The trial court acknowledged that Duncan's testimony "is a problem" and instructed the prosecutor to tell the jury it was a driver's license database, and also called Detective Duncan to the bench and advised him to specifically tell the jury that he was checking a driver's license database. Defense counsel again moved for a mistrial, arguing that the testimony indicated that Appellant had a prior criminal record and that the bench conference with Detective Duncan highlighted this fact. The court again overruled the motion. Thereafter, the Commonwealth asked Duncan if by cross-referencing the driver's license database, he was able to ascertain Appellant's name. Duncan responded affirmatively.

On appeal, Appellant contends that the trial court erred in denying his motions for a mistrial. Appellant argues

that the statements of the robbery detective, Duncan, indicating that he had known Appellant for years and that he had found Appellant in "a database", revealed to the jury that Appellant had a prior criminal record, in violation of KRE 404(b). A mistrial

> is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity. The error must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way[.]

*Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky.2005) (citations and internal quotation marks omitted) (overruled on other grounds by *Padgett v. Commonwealth*, 312 S.W.3d 336 (Ky.2010)). Whether to grant a mistrial is within the sound discretion of the trial court, and the trial court's ruling will not be disturbed absent an abuse of that discretion. *Id.*

We see no abuse of discretion. Duncan's remark that he had known Appellant since "19 ..." was fleeting, was not said in an accusatory tone, and did not indicate how the detective knew Appellant. Duncan's statement that he found Appellant's name in "a database" was made in the context of the prosecutor's questioning him about cross-referencing Appellant's changed name and original name in the driver's license database. The detective did not indicate that he was referring to a robbery or otherwise criminal database, and we believe his subsequent specific acknowledgment that he found Appellant's original name through the driver's license database cured any prejudice.

For the aforementioned reasons, the judgment of the Jefferson Circuit Court is affirmed.

ABRAMSON, CUNNINGHAM, NOBLE, and SCOTT, JJ., concur.

VENTERS, J., dissents by separate opinion in which MINTON, C.J., joins.

VENTERS, Justice, dissents by separate opinion:

For two reasons I respectfully disagree with Majority's opinion on three of the five second-degree robbery charges: namely, the incident at the Fifth–Third bank on May 1, 2006, the incident at the Central Bank on June 29, 2006, and the incident at the National City bank on October 23, 2006.[14] First, I believe the Majority expands the interpretation of the statutory language "threatens the immediate use of physical force" beyond the intent of the legislature. Second, even under the Majority's broad interpretation of that phrase, on the three incidents cited above, Appellant was entitled to an instruction on the lesser offense of theft by unlawful taking.

*I. A Theft Instruction Was Required Because Appellant's Conduct Was Ambiguous With Regard to the Element of Threatening the Use of Force*

Because I see it as the more egregious oversight, I will address the second point first. It is undisputed that no weapon or dangerous instrument was involved in any of three incidents. No physical force was used upon anyone. The perpetrators did not flourish or brandish a weapon or a dangerous object of any kind. They did not by words or gestures express or imply the presence of a weapon so as to threaten any person present. There were no words spoken or written, nor gestures made, to communicate the notion that physical force of any kind would be employed against any person if the theft was resisted. There

was an aggressive demand for money under frightful circumstances. A reasonable jury could reasonably believe from the evidence introduced at trial and from the second-degree robbery instruction given, that neither Appellant nor any accomplice had "threaten[ed] the immediate use of physical force upon another person" as required by KRS 515.030(1).

Even under the Majority's interpretation of what constitutes a threat to use immediate physical force, the facts here do not *compel* the finding that such a threat was made. In effect, by affirming the denial of a theft instruction, the majority opinion grants the Commonwealth a summary judgment on the essential element of robbery in question here: did Appellant, in the course of stealing money from the banks, "threaten the immediate use of physical force upon another person?" Reasonable jurors could very well disagree on the answer to that question. Yet the Majority has decreed it to be so. A reasonable juror could conclude that Appellant did not so threaten, in which case he should have been exposed to criminal culpability for theft. By denying that option, the trial court forced the jury to choose between acquitting a thief and convicting him of robbery despite the lack of a threat to use immediate physical force against another person.

Fidelity to the principles set by this Court in *Swain v. Commonwealth*, 887 S.W.2d 346 (Ky.1994) compels the giving of a theft instruction. There, on three separate incidents to steal money from convenience stores, "appellant did not reveal or refer to any weapon. He merely demanded money while keeping his hands in his pockets." *Id.* at 347. We agreed that

---

14. The incident in which a weapon was displayed and the incident in which force was actually used upon the bank teller very clearly

satisfy the elements of robbery, and those charges were properly submitted to the jury.

such evidence would not support a first-degree robbery charge (requiring the possession of a weapon). However, because the menacing gesture of keeping a hand in the pocket might imply the possession of a weapon and the intent to use physical force if necessary to complete the theft, we held that an instruction on second-degree robbery and theft were required.

As to the count in which appellant merely stated that he had a gun but did not flourish it, the trial court should have instructed on second degree robbery. It would not have been unreasonable for the jury to believe that appellant had no gun and if it so believed, a conviction for second degree robbery would have been authorized. Upon retrial of this count, the jury should be so instructed and authorized to find appellant guilty of first degree robbery or second degree robbery, depending upon what it believes from the evidence. *As to the three counts in which no weapon was seen or mentioned but in which appellant demanded money while having at least one hand inside his clothing, the jury should have been instructed on robbery in the second degree and theft by unlawful taking. As to robbery in the second degree, the facts presented here are sufficient to constitute a threat of immediate physical force if the jury believes from the evidence there was such, or theft by unlawful taking if it believes there was no threat of physical force.*

*Id.* at 348. (Emphasis added.)

*Swain* is compelling and squarely on point, but the Majority opinion relegates it to a footnote and declares it to be "an anomaly and limited to its own facts." Inconveniently, *Swain's* "own facts" differ in no material way from the facts present here. *Swain* is an "anomaly" that, according to Westlaw, has been favorably cited in subsequent appellate opinions at least 30

times, 10 of which are related to the very paragraph quoted above. We do no service to the dignity of this Court, much less to the litigants before us, by sweeping our binding precedent under the rug in such a cavalier fashion.

Instead of relying upon *Swain*, the majority rests its case upon *Lawless v. Commonwealth*, 323 S.W.3d 676 (Ky.2010). However, in *Lawless* we voiced no disagreement with *Swain* and cited it favorably. We differentiated *Swain*, where the simple "hand-in-the-pocket" did not accompany any other gesture implying possession of a weapon and its inherent threat of force, from *Lawless*, where "not only did Lawless keep her hand in her pocket but that she made gestures as though she had a gun." *Id.* at 678. Those additional distinguishing gestures, we concluded, were "clearly intended to further the theft by creating the impression that she was armed." *Id.* at 681. Lacking the ambiguity present in *Swain* concerning the expression of a threat, *Lawless* properly concluded that the unambiguous gestures were calculated by Lawless to express the threat of bodily harm implicit in the possession of a weapon, leaving no room for a theft instruction.

Here, we have not even a hand in the pocket, nor any other gesture, to constitute the expression of a threat to use physical force. The conduct of Appellant and his accomplices at the three banks was, at most, ambiguous with respect to the expression of a threat to use force upon a person. The giving of a theft instruction is compelled by *Swain* and it is consistent with *Lawless*.

I would therefore reverse the three second-degree robbery convictions cited above and remand for a retrial with instructions incorporating the lesser offense of theft, provided the evidence upon retrial so warrants.

## II. The Majority Misconstrues KRS 515.030(1) With Respect To the Phrase "Threatens the Immediate Use of Physical Force"

The phrase "threatens the immediate use of physical force" is ambiguous. In one sense, "threaten" is an active verb. As so used, to "threaten" would require an act, in words or gestures, to express or imply a warning that physical force will be employed to achieve an objective, for example, to enforce the demand for money. In another sense, "threaten" can be used as a passive verb, to mean simply a presence that imparts to others concern for the possibility of some unpleasant consequence. The Majority applies the latter construction to the facts of this case to reach its conclusion that Appellant's aggressive demands were threatening to those present and instilled in them a fear of physical harm, even if Appellant never expressed or implied with words or gestures that physical force might be employed. I believe that interpretation is inconsistent with the legislative intent implicit in KRS 515.030, and therefore dissent.

Prior to the 1974 enactment of the Kentucky Penal Code (KRS Chapters 500 through 534), robbery was defined by our common law as "the act of feloniously and forcibly taking from the person of another, goods or money *by violence or by putting him in fear.*" *Correll v. Commonwealth,* 317 S.W.2d 886 (Ky.1958) (Citations omitted; Emphasis added). Our pre-penal code law was consistent with the interpretation the Majority now reads into the Kentucky Penal Code. In *Williams v. Commonwealth,* 721 S.W.2d 710, 712 (Ky. 1986), we noted that the sections of the Model Penal Code (Article 222.1), which informed the drafters of the Kentucky Penal Code, used the following phrase as an element of robbery: "(b) threatens another with *or purposely puts him in fear of immediate serious bodily injury.*" (Emphasis added.) Thus, the Model Penal Code is consistent with our pre-penal code notion of robbery to the extent that both include among the elements of robbery, conduct putting someone in fear of injury. If, with conscious awareness of the Model Penal Code language and our common law definition, our legislature intended to retain within Robbery in the Second Degree (KRS 515.030) the element of putting another in fear, it would have used that essential language. By omitting that phrasing, and using the verb "threatens" in conjunction with another active verb, "uses," the General Assembly intended "threatens" to mean the expressed or implied communication by the perpetrator of an intent to use force, not merely any conduct that puts another person in fear.

Our criminal code attains fairness and justice because it attempts to establish objective criteria by which we must judge the conduct of others. It does so in the case of robbery second-degree by identifying the specific conduct that will subject one to punishment as a robber. The Majority conflates the objective act of making a threat to use physical force with the subjective effect that may be felt by others. An aggressive demand expressed under scary circumstances is not an objective substitute for the actual expression, by words or gestures, of threat to use immediate physical force. The Majority unhinges the conduct of the accused from objective requirements of our statute as it is now written, and binds it to the subjective response of others, contrary to the language of the statute. Where, along the sliding scale between a polite request for money to which one is not entitled and the aggressively hostile and frightening demand does theft or attempted theft become robbery? Does the vagrant in a dark street at night become a robber if,

because of his scary countenance, a passer-by is too frightened to deny his request for a handout? The Majority opinion cannot answer that question, and we are left with a case-by-case process to determine what circumstances may authorize a robbery prosecution. Prosecutors, judges, and juries, will differ in their respective views, and so we can have uneven or discriminatory prosecution. The answer can be found where it ought to be found, in the statute. If the vagrant, by words or gestures, expresses or implies an intention to use physical force if his request is denied, then he is a robber. The conduct qualifying him as such can be ascertained from the clear, concrete and objective evidence, and is not dependent upon the degree of fear that one might infer from his presence.

Prior to our decision in *Wilburn v. Commonwealth*, 312 S.W.3d 321, (Ky.2010), we had allowed the objective element of "deadly weapon" for first-degree robbery to be satisfied by the victim's subjective fear that the robber had a weapon, even when there was no evidence that a weapon actually existed. After years of adhering to our common law conception of armed robbery despite clear statutory language to the contrary, in *Wilburn* we restored the objectivity to robbery first degree by requiring evidence that an actual, not imaginary, weapon was used. We recognized in *Wilburn* that no amount of intimidation by the robber can turn a finger in the pocket into a gun. By the same token, no amount of fear on the part of the victim can turn an aggressive demand for money into a specific threat of immediate force against a person. As we did in *Wilburn* with the deadly weapon element of robbery first degree, we should now remove the vestiges of our common law past from second-degree robbery, and recognize that the statutory language "threaten[ing] the immediate use of physical force upon an-other person" does not mean "putting an-other in fear." It requires an expressed or implied threat, communicated by gestures or words, of force upon another person. A frightfully aggressive appearance from which one might infer the use of such force does not satisfy the requirement of our statute.

For the foregoing reasons, I respectfully dissent.

MINTON, C.J., joins.