AS MODIFIED: MARCH 14, 2019
RENDERED: NOVEMBER 1, 2018
TO BE PUBLISHED

# $Supreme Court of Kentucky



2017-SC-000156-MR

SHAWN TIGUE            APPELLANT

V.
        
ON APPEAL FROM BELL CIRCUIT COURT
HONORABLE ROBERT COSTANZO, JUDGE
NO. 03-CR-00082

COMMONWEALTH OF KENTUCKY          APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**<u>AFFIRMING, IN PART, REVERSING, IN PART, AND REMANDING</u>**

A circuit court jury found Shawn Tigue guilty of first-degree murder, first-degree burglary, second-degree possession of a controlled substance, third-degree possession of a controlled substance, and possession of a controlled substance not in its original container. After finding the first-degree burglary conviction to be an aggravator, the jury recommended a sentence of life without the possibility of parole, which the trial court adopted. The parties agreed on sentences for the remaining convictions: 20 years for the first-degree burglary conviction, 12 months for the two possession convictions, and 90 days for the improper-container conviction. Tigue then appealed directly to this Court as a matter of right, raising several issues for review. We reverse the

portion of the judgment that contains Tigue's first-degree murder conviction, affirm the remainder of the judgment, and we remand the case to the trial court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND.

At 12:55 p.m. on April 11, 2003, the dead body of elderly, bedridden Bertha Bradshaw was found lying on her bed, the victim of a gunshot wound to the back. Authorities were notified, and a neighbor reported seeing a vehicle belonging to Shawn Tigue, leaving the Bradshaw residence at 10:30 that morning. An inspection of the residence revealed pry marks on the doorjambs of the two doors leading into the house and a large hole in a door.

Based on this information, Trooper Jeremy Lee performed a traffic stop on Tigue's maroon Chevrolet truck, in which Tigue was the passenger and his wife the driver. After a search of Tigue and the truck, Trooper Lee found a prescription pill bottle on Tigue that "had a scraped and tampered label and three types of drugs" that Tigue identified as being his medication. Inside the truck was an army bag filled with shotgun shells. Trooper Lee then brought Tigue in for questioning.

At 6:50 that evening, Detective Don Perry interviewed Tigue, noting he appeared to be intoxicated. Tigue told Detective Perry that he bought the Xanax that was found on his person from a drug dealer. For another of the drugs found on his person, hydrocodone, Tigue claimed he had a prescription, which he claimed helped alleviate his self-diagnosed seizures. Tigue also claimed that the army bag and shotgun shells belonged to his late father.

2

Tigue told Detective Perry that he left his house at around 9 or 10 that morning to visit his cousin, Buddy Tigue. Tigue then stated that he and Buddy made a run to Ferndale for illegal drugs. Tigue admitted to having ingested "about four" of the Xanax pills. Tigue also spoke about the pill bottle, stating that identifying information on it had been scratched off. Nonetheless, Tigue had the prescription filled at the Rite Aid Pharmacy. Tigue stated that he was wearing a red flannel shirt that morning but had changed his clothes.

Tigue told Detective Perry that he "heard Bertha Bradshaw got shot just before we left . . . for . . . brother's wife's birthday party." Tigue then explained his contact with Bradshaw: "I don't know her very well. When I was little . . . she would give us pops and cookies and stuff like that." Tigue denied knowing about Bradshaw's medical condition, for which she was prescribed pain killers.

The next morning, Detective Perry took possession of several evidentiary items, including Bradshaw's purse found at a nearby Rite Aid Pharmacy, the pill bottle, and the army bag with the shotgun shells. Detective Perry then decided to interview Tigue again. He told Tigue details of what he knew from his investigation so far and proposed various scenarios as to what occurred. Tigue then stated that between 10 a.m. and noon on April 11, an individual named Danny Smith brought him the army bag, the pill bottle with the scratched-off label, and a Xanax prescription belonging to Bradshaw. Tigue stated that Smith told him to fill the prescriptions, which they would split, and to get rid of the army bag. Tigue stated that he "kind of knew that [Smith] had

3

robbed somebody," but denied knowing that Bradshaw had been murdered. Upon conclusion of the interview, Detective Perry started looking for Smith.

Within 30 minutes of leaving the second interview, Detective Perry was paged to return because Tigue wanted to speak with him further. Before Detective Perry began his third interview of Tigue, Tigue stated that he wanted to give a "confession." Tigue then proceeded to outline his purported involvement in the events of this case.

According to Tigue, he drove to the Bradshaw residence, parking his truck on Bradshaw's property, but did not remember at what time this occurred. Tigue knocked on the door, but no one answered. The entrance to the residence had two doors to be opened before entry into the residence was possible. Tigue used a screwdriver to break through the first door, then "rammed his fist" through the second door. Tigue even attempted to show officers the marks on his hand from the break in.

Tigue then entered the residence and proceeded throughout the house. Tigue admitted he intended to rob Bradshaw. He saw Bradshaw lying in bed facing the window. He entered a room across from the bedroom and found Bradshaw's husband's gun. He took the gun, stating that he did so "just to have it, just in case she got up, just to scare her with it, so I could have time to get away." Bradshaw then called out, asking, "Who's there?" Tigue then turned the safety off the gun and shot Bradshaw in the back.

Tigue then took Bradshaw's prescription pills, her purse, the gun, and her husband's army bag with shotgun shells. Tigue stated that he was high on pills during this time, "but that ain't no excuse."

Tigue left the residence and hid the gun at a cemetery. After the interview, Tigue led police to the location of the gun, which they recovered.

At trial, various witnesses other than those identified above testified.

A Rite Aid pharmacist testified to having filled Bradshaw's prescription on April 11. The pharmacist testified that a young, tall, slender, dark-haired male brought Bradshaw's bottle in to fill. The pharmacist stated that he knew it was Bradshaw's bottle based on the unique identifiers he places on each patient's prescription bottles. Although Bradshaw herself did not come in to fill the prescription, the pharmacist stated that no restrictions existed on who could get a prescription filled. According to the pharmacist, the prescription was for 60 Xanax pills, and he admitted to mixing pill brands, but not strengths, as a part of his practice. Another Rite Aid pharmacist confirmed that on April 11, an individual "brought in a pocketbook to me" having a prescription with the name "Bertha Bradshaw" on it.

Buddy Tigue, Tigue's cousin, also testified. Buddy stated that Tigue was at Buddy's house at noon on April 11 "to purchase some pain pills from [Buddy]," having driven up in a maroon Chevrolet truck. Buddy stated that he sold Lorcet and Xanax pills to Tigue. Buddy also stated that "[Tigue] pulled a pill bottle out of his pocket and put them back in his pocket." Buddy then stated that Tigue offered to sell Buddy a gun, a "12-gauge Remington pump,

5

blue steel, looked like a brand-new gun to me." Buddy then said that Tigue told him the gun was "hot." Buddy did not buy the shotgun.

Charles Griffin also testified. Griffin was riding his four-wheeler to get his mail the morning of Bradshaw's murder at around 8:15 or 8:30. Griffin testified to having heard a gunshot, knowing that it was a gunshot because of his vast hunting experience. After hearing the shot, Griffin testified to having seen Danny Smith trying to get out of a tangle of vines at the bottom of a hill on the Bradshaw premises. Smith did not have anything in his hands; rather, "He was using his hands to get through the thicket."

Fay Neal, Tigue's mother, testified. She was staying at a friend's house in Kettle Island on April 11. It was the residence of Billie Storms, and Neal was there helping care for Storms's elderly, bedridden mother, Juanita. Neal stated that Tigue came to see her at 8:30 a.m. to get the key to their shared post-office box. According to Neal, Storms and her sister, who were away from the house at the time, came back to the house and shared a smoke with Tigue. Billie Storms also testified for a very limited purpose: to tell the jury that Neal told Storms that Neal caught Tigue attempting to break into Storms's mother's room. Neal testified that Storms is "best friends" with Danny Smith's mother.

Virginia Middleton, Danny Smith's aunt, also testified. She stated that on April 11, at about 9 or 9:30 a.m., she saw Smith "passing towards the bridge up to her brother's house" on foot. Middleton is a resident of Dorton Branch, which, according to trial testimony, is about 20 minutes from Kettle Island.

Middleton testified that Smith "was wearing a camouflage jacket and a camouflage pair of pants."

Teresa Monroe, Tigue's sister, testified at trial that Smith was like family to her and was constantly around. Monroe testified about Smith's aggressive behavior, prompting her to notify police of his behavior for fear of what he would do to her children. Although she had not heard Tigue's confession to the ultimate events of this case, Monroe was convinced that it was false.

Lastly, Tigue himself, also acting as hybrid counsel, testified at trial. Tigue's testimony was very different from the confession he gave to Detective Perry. Tigue stated that Danny Smith killed Bradshaw. He said that while returning from the visit with his mother at Storms's house in Kettle Island, he encountered Smith, who asked him for a ride, to which Tigue agreed. Tigue stated that once in the truck, "He explained to me that he went to [Bradshaw's] house and he believed he killed her." Tigue said that he pulled the truck over, but Smith refused to get out. Tigue then said that he and Smith got into a heated argument, and Tigue felt as though his family was in danger.

Because of this fear of Smith, Tigue agreed to drive Smith to Bradshaw's house. Tigue stated, "We went straight in, under his direction, I wiped the kitchen cabinets. I went and wiped down the cabinets. I noticed a hole and stuff on the door. I followed him back to the back of the house and checked [Bradshaw's] pulse and she was obviously deceased." Tigue then admitted to taking the purse. Tigue also stated that he "was supposed to get rid of the gun [and] purse and fill the prescription at Rite Aid."

After he filled the prescription at Rite Aid, Tigue and Smith split the pills and Tigue "started taking them immediately." Tigue then testified that he "tried to work on my mom's brakes and then I went in and passed out." The next thing he remembered was being pulled over by the police.

When asked about his confession, Tigue stated that he "was willing to tell [police] whatever they wanted to hear to get out of that situation" and that he was "pill sick." Additionally, "the confession is false, and anybody can see that." Tigue did not tell police about Smith because he was afraid for his family members' lives and "based on all my experience with him that day, I think he would have slammed the door on [Detective] Perry's face and made good on his threats." Tigue ended his testimony by stating, "Danny Smith is responsible for the murder of Bertha Bradshaw and nobody wants to look into it."

## II. PROCEDURAL HISTORY.

This case originated in 2003 with the indictment against Tigue that resulted in a guilty plea. During final sentencing, Tigue requested to withdraw his guilty plea, which the trial court denied. Tigue's collateral attack upon the resulting judgment, a Kentucky Rules of Criminal Procedure ("RCr") 11.42 motion, eventually made its way to this Court. We found Tigue's counsel to have been ineffective, reversed his convictions, and remanded the case to the trial court for a new trial.[1] At the trial following the remand, the jury found Tigue guilty of the charges previously mentioned, and the trial court entered

---

[1] *Commonwealth v. Tigue*, 459 S.W.3d 372, 377–78 (Ky. 2015).

judgment sentencing him to life in prison without the possibility of parole. From that judgment, Tigue now appeals to this Court.

## III. ANALYSIS.

### A. Billie Storms's Testimony

Tigue's first issue is an allegation of trial court error for having allowed certain testimony into evidence. This alleged error is indisputably preserved for our review on appeal. We outline the factual circumstances of this issue in detail because Tigue has alleged several errors stemming from the admission of this evidence.

The morning of Tigue's trial, the Commonwealth brought to the attention of the trial court that it had been contacted by an individual, Billie Storms, the day before trial with apparently new information about the case. Storms did not have personal knowledge of the events that transpired in this case; rather, the extent of her knowledge was that Tigue's mother, Fay Neal, told Storms that Neal caught Tigue attempting to break into Storms's mother's room the morning of the Bradshaw murder.

The Commonwealth offered several reasons to use this testimony. First, the Commonwealth believed that this testimony could be admitted under the identity prong of Kentucky Rules of Evidence ("KRE") 404(b)(1), because it established Tigue's modus operandi. The purported events that Storms testified to, happened the same morning that Tigue broke into Bradshaw's house. In both situations, the victim was a bedridden, elderly female. Additionally, the

9

victims were taking pain medication. The Commonwealth argued at trial that Tigue was close enough to both victims to know of their pain-medication use.

The Commonwealth also argued this information was admissible to establish Tigue's whereabouts on the morning of the Bradshaw murder. Lastly, the Commonwealth asserted it could use this evidence to impeach Neal, should Neal give any testimony that conflicted with it.

The trial court noted the respective arguments of both the Commonwealth and Tigue and issued a 21-page ruling on the proposed evidence. The trial court ruled: that the evidence, i.e. Storms's testimony, could not be presented during the Commonwealth's case-in-chief under the modus operandi exception to KRE 404(b)(1), despite having found that exception to be satisfied, because the witness came to light on the eve of trial; Storms's testimony could only be admitted for the purpose of impeachment, not as substantive evidence; and that it would issue a limiting instruction to the jury to ensure that Storms's testimony would not be used as substantive evidence of Tigue's guilt.

As it happens, during the Commonwealth's direct examination of Neal, Neal denied telling Storms that Tigue had attempted to break into Storms's mother's room. The Commonwealth proceeded to call Storms for rebuttal, to which Tigue objected. The trial court allowed Storms to testify, and she told the jury that Neal told her that Neal caught Tigue trying to break into Storms's mother's room. After Storms finished testifying, the trial court admonished the jury to use the testimony only for impeachment, not any substantive purpose.

10

Tigue alleges a host of purported errors based on these facts: the Commonwealth should not have been able to ask Neal about what Storms told her; the Commonwealth used Storms's testimony "as a guise or subterfuge" to impeach Neal with testimony that would otherwise be inadmissible; the trial court improperly ruled that KRE 404(b)(1)'s identity exception was satisfied; the impeachment was improper because it was done on a collateral fact; Storms's testimony was evidence-in-chief that was improperly admitted during the rebuttal phase; Storms's testimony should have been excluded because of late notice and the defense's inability to investigate it; and finally, the Commonwealth improperly "emphasized the substantive nature of the impeachment evidence to the jury" in closing argument.

"[W]e review a trial court's evidentiary rulings for an abuse of discretion."[2] "The test for abuse of discretion is whether the trial court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[3]

The Commonwealth's stated intent as to the use of Billie Storms's testimony was clear, as was seemingly admitted by the Commonwealth in its brief: The Commonwealth wanted the jury to hear that Tigue tried to break into another person's house the same morning he broke into Bradshaw's house and killed her. This is shown by the Commonwealth's KRE 404(b)(1) modus

---

[2] *Meece v. Commonwealth,* 348 S.W.3d 627, 645–46 (Ky. 2011) (citing *Penman v. Commonwealth,* 194 S.W.3d 237, 245 (Ky. 2006)).

[3] *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999).

operandi argument, by the Commonwealth's strategy of impeaching its own witness, and by the Commonwealth's argument in closing reminding the jury of Storms's testimony.

The trial court's involvement in all of this was to allow Storms's testimony to be admitted, but only for the limited purpose of impeaching Neal. Taking advantage of this ruling, the Commonwealth impeached its own witness through its own examination of Neal and later examination of Storms. "[A]lthough a party can impeach his own witness,[4] he cannot knowingly elicit testimony from a witness as a guise or subterfuge in order to impeach the witness with otherwise inadmissible testimony."[5]

Billie Storms's testimony was inadmissible for two reasons. First, the burglary of which Tigue was convicted and the attempted burglary that Tigue purportedly committed were not so "'strikingly similar' in factual details, such that 'if the act occurred, then the defendant almost certainly was the perpetrator'" to fall under the KRE 404(b)(1) admissible-propensity evidence exception of modus operandi to prove the identity of the perpetrator.[6] Second, the fact upon which Neal was impeached was a collateral matter.[7]

---

[4] KRE 607.

[5] *Slaven v. Commonwealth*, 962 S.W.2d 845, 858 (Ky. 1997) (citing *United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992); *United States v. Gomez-Gallardo*, 915 F.2d 553, 555 (9th Cir. 1990); R. Lawson, *The Kentucky Evidence Law Handbook* § 4.05, p. 172 (3d ed. Mitchie 1993)).

[6] *Graves v. Commonwealth*, 384 S.W.3d 144, 149 (Ky. 2012) (quoting *Woodlee v. Commonwealth*, 306 S.W.3d 461, 464 (Ky. 2010)) (quoting *Clark v. Commonwealth*, 223 S.W.3d 90, 96 (Ky. 2007)).

[7] *See Commonwealth v. Prater*, 324 S.W.3d 393, 397 (Ky. 2010) ("[O]ur case law continues to hold that impeachment on collateral matters . . . is not allowed.").

Tigue predicated his defense on a denial of involvement in the initial burglary and murder, claiming instead that Smith was the true culprit. Responding to this argument, the Commonwealth sought to introduce Storms's testimony to the effect that Neal told her that Tigue tried to break into Storms's mother's residence, using the device of KRE 404(b)(1).

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible: (1) If offered for some other purposes, such as . . . identity."[8] "While evidence of prior crimes, wrongs, or acts, is inadmissible to prove the propensity of an accused, such evidence may be admissible to prove the identity of a perpetrator when the evidence of other crimes indicates a *modus operandi*."[9]

"To indicate *modus operandi*, the two acts must show 'striking similarity' in factual details, such that 'if the act occurred, then the defendant almost certainly was the perpetrator[.]' That is, the facts underlying the prior bad act and the current offense must be 'simultaneously similar and so peculiar or distinct,' that they almost assuredly were committed by the same person."[10] Professor Lawson identified the following statements, taken from the Fifth

---

[8] KRE 404(b)(1).

[9] *Graves*, 384 S.W.3d at 149 (quoting *Woodlee*, 306 S.W.3d at 463) (quoting *Billings v. Commonwealth*, 843 S.W.2d 890, 893 (Ky. 1992)).

[10] *Graves*, 384 S.W.3d at 149 (quoting *Woodlee*, 306 S.W.3d at 463) (quoting *Clark*, 223 S.W.3d at 96)).

Circuit's decision in *U.S. v. Myers*,[11] as helpfully outlining the modus operandi doctrine:

> The probity of evidence of other crimes where introduced for this purpose depends upon both the uniqueness of the *modus operandi* and the degree of similarity between the charged crime and the uncharged crime. Of course, it is not necessary that the charged crime and the other crimes be identical in every detail . . . . But they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person. The more unique each of the common features is, the smaller the number that is required for the probative value of the evidence to be significant. But a number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together.[12]

Simply put, the trial court abused its discretion when it concluded that the KRE 404(b)(1) identity exception was satisfied. We cannot stretch the concept of the modus operandi KRE 404(b)(1) identity exception to afford admissibility of this testimony as evidence under that exception.

The similarities between the two incidents, as identified by the Commonwealth, are: the defendant purportedly knew both victims; both victims were elderly women confined to bed; both were prescribed pain medication; and Tigue tried unlawfully to enter their homes. The trial court additionally noted: the geographical location was about the same; both purported burglaries occurred during the daytime; and Tigue knocked before trying to enter in both situations.

---

[11] 550 F.2d 1036, 1045 (5th Cir. 1977).

[12] Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25[5] (4th ed. 2012 update) (quoting *Myers*, 550 F.2d at 1045)).

14

In comparison to these incidents, we note two situations that Professor Lawson identifies as satisfying the modus operandi exception.[13] In *Spencer v. Commonwealth*, the defendant, dressed as a police officer and using a police-like vehicle, stopped the victim's car and asked for her driver's license, drove the victim's car to a secluded place, and committed rape.[14] In *United States v. Bohr*, the defendant defrauded farmers by creating a scheme in which he would purportedly sell fertilizer to farmers without actually delivering it to them and pocketing their money.[15]

In complete contrast to those two cases, Tigue's case lacks 'striking similarity' in factual details, such that 'if the act occurred, then the defendant almost certainly was the perpetrator,'" no "facts underlying the prior bad act and the current offense" that are "'simultaneously similar and so peculiar or distinct,' that they almost assuredly were committed by the same person." Tigue's defense was that someone else committed the burglary that led to the murder of Bradshaw. While Bradshaw and Storms's mother may have been elderly and bedfast and taking pain medication, none of the facts identified by the Commonwealth or trial court conclusively identify Tigue himself as the perpetrator.

There was no identifying fact that Tigue himself was the one who tried to enter the homes on both occasions. In other words, there was no pretending to

---

[13] Lawson, *supra* fn 12.

[14] 554 S.W.2d 355, 358 (Ky. 1977).

[15] 581 F.2d 1294, 1298-99 (8th Cir. 1978).

be a police officer,[16] no pretending to be a fertilizer salesman.[17] Simply because the victims share some commonality does not make "assured" the probability that the perpetrator was the same person in both situations; on the facts identified by the Commonwealth and trial court, it could be just as likely that Tigue's alleged alternative perpetrator was the one to enter Bradshaw's home and murder her. This is the lynchpin of the modus operandi identity KRE 404(b)(1) exception. And it was not met here.

Additionally, the trial court erred when it admitted this evidence for impeaching Neal. "[O]ur case law continues to hold that impeachment on collateral matters by extrinsic evidence is not allowed."[18] We identified in *Prater* that "decisions on collateralness fall within the discretion of the judge and are reviewed for abuse of that discretion . . . ."[19] We must note, however, that this rule announced in *Prater* applies *"when a party has opened the door to such issues."*[20] We also note that the party that "opened the door" to the impeachment in *Prater* was the *opposing* party.[21]

In this case, all the door-opening was done by the Commonwealth through its own witness. The Commonwealth called Neal as a witness, asking her about why Tigue was at Storms's mother's residence the morning of the

---

[16] *Spencer*, 554 S.W.2d at 358.

[17] *Bohr*, 581 F.2d at 1298–99.

[18] *Commonwealth v. Prater*, 324 S.W.3d 393, 397 (Ky. 2010) (internal citations omitted).

[19] *Id.* at 398.

[20] *Id.* at 399.

[21] *Id.* at 401.

16

Bradshaw murder. The Commonwealth specifically asked Neal on direct examination, "Did you tell Ms. Storms, Billie Storms, that your son had attempted to break in the bedroom window where their bedridden elderly mother was while you were there?" To which Neal responded, "No, I did not." "[A]lthough a party can impeach his own witness,[22] he cannot knowingly elicit testimony from a witness as a guise or subterfuge in order to impeach the witness with otherwise inadmissible testimony."[23]

More importantly, we can assuredly say that the Commonwealth's impeachment of Neal was done on a collateral fact. Although numerous definitions of *collateral* exist,[24] they need not be specifically enumerated to identify why the fact upon which the impeachment was based was collateral.

Whether or not Shawn Tigue attempted burglary at Storms's mother's residence has nothing to do with whether he committed burglary and murder at the Bradshaw residence. The testimony of Fay Neal assisted in establishing Tigue's *whereabouts* the morning of the Bradshaw burglary and murder, and Billie Storms's testimony did not contradict the fact that Tigue was, in fact, at Storms's mother's residence, which was the fact to which Neal testified. What exactly Tigue was doing while he was at Storms's mother's residence, unless related to the commission of the crime at the Bradshaw residence, is completely irrelevant to the crimes charged. And, in fact, nothing about what

---

[22] KRE 607.

[23] *Slaven*, 962 S.W.2d at 858 (citing *Carter*, 973 F.2d at 1513; *Gomez-Gallardo*, 915 F.2d at 555; Lawson, *supra* note 12 at § 4.05).

[24] Lawson, *supra* note 12 at § 4.05[1]–[4].

Tigue did at Storms's mother's residence had anything to do with what he did at the Bradshaw residence, apart from the Commonwealth's insinuation that what he did at Storms's mother's residence evidenced a propensity to commit the burglary at the Bradshaw residence. But, as already identified, other-bad-acts evidence is inadmissible to show action in conformity therewith.[25]

The Commonwealth has not shown Tigue's actions at Storms's mother's residence to be relevant to his actions at the Bradshaw residence. The only relevancy of Neal's, and therefore Storms's, testimony that the Commonwealth articulates is establishing Tigue's whereabouts and showing that the two burglaries are similar, the former uncontradicted and the latter improper. Storms's testimony as to what Tigue did at Storms's mother's residence does not conflict at all with Neal's testimony that Tigue was at Storms's mother's residence; both testimonies establish that Tigue was at Storms's mother's residence the morning of the Bradshaw burglary. And we have already determined that evidence of the similarity of the burglaries should have been ruled inadmissible for failing the KRE 404(b)(1) modus operandi exception.

For these reasons, the trial court erred when it ruled Storms's testimony admissible for any purpose. As such, the Commonwealth's reiterating of this improper evidence in closing argument was also erroneous.

Tigue also makes two arguments as to why admission of Storms's testimony was procedurally deficient. Because, as we have already determined

---

[25] KRE 404(b).

that Storms's testimony should not have been admitted, and because these procedural issues are unlikely to arise again, we need not address these arguments.

## B. Destruction of Evidence

Tigue next takes issue in multiple ways with the trial court's response to the destruction of possibly exculpatory and relevant evidence. This issue is preserved for our review.

It is undisputed that Detective Perry, after Tigue's 2004 guilty plea, destroyed 31 out of the 37 pieces of evidence collected in this case and gave the remaining six items to the Bradshaw family. Tigue argues that the trial court erred at the new trial in several ways in its handling of this issue. Tigue proffers three things that the trial court should have done to rectify the harm caused by this missing evidence: (1) the indictment should have been dismissed; (2) all the evidence that was disposed of should have been suppressed and no mention of it made; or (3) a missing-evidence instruction should have been given. Lastly, Tigue argues that the limitations the trial court imposed on his ability to examine the Commonwealth's witnesses on the issue violated his right to present a defense.

We start with the relevant facts. Recall that in 2004, Tigue pleaded guilty to the murder of Bradshaw but sought to withdraw his guilty plea. Detective Perry attended the evidentiary hearing that resulted in the trial court's denial of Tigue's guilty-plea withdrawal. The trial court made comments that Tigue

argues alerted Detective Perry to the fact that Tigue's case was not final, such as, "Shawn, I'll be seeing you back. I feel relatively certain about that."

Later, Tigue requested items from the court record to be sent to him in preparation of his pro se RCr 11.42 motion. Later that year, Teresa Monroe, Tigue's sister, voluntarily sought out Detective Perry and asked him to investigate Danny Smith's possible involvement in this case, but Detective Perry declined to do so.

A little more than a year later, Detective Perry destroyed the 31 pieces of evidence and returned the other six. The destroyed evidence included clothing fibers, various strands of hair, a potholder, and various DNA samples harvested from the victim. Tigue suggests that some of this evidence could be used to exculpate him by its tracing to Danny Smith.

At an evidentiary hearing before the new trial, Detective Perry stated that he destroyed the items of evidence because he thought the case was over. Detective Perry stated that he did not recall the fact that Tigue attempted to withdraw his guilty plea. He said the first time he became aware of the request to withdraw the guilty plea was when this Court ordered a new trial in 2015, ten years after the fact. Additionally, he acknowledged that the trial court never ordered destruction of the evidence but that every order involving disposition of the evidence had his police sergeant's and his own signature.

Before Tigue's new trial, the parties engaged in extensive motion practice, disputing how and to what extent the jury should be informed about the missing evidence. Tigue proffered a variety of arguments to support a finding of

bad faith on the part of Detective Perry, including that Detective Perry: violated Kentucky State Police policies and procedures; violated KRS 524.140, which purportedly requires a trial court order before the disposition of evidence with a biological substance on it; and failed to investigate further potentially exculpatory evidence.

Ultimately, the trial court ordered that: the Commonwealth could use the destroyed evidence at trial; any statement referring to Tigue's prior guilty plea, including a purported explanation by the Commonwealth as to why the evidence got destroyed, was inadmissible; a missing-evidence instruction was not warranted for lack of bad faith on the part of Detective Perry; the jury should simply be informed that the evidence was destroyed or returned to the Bradshaw family and the parties would be allowed to "briefly explor[e] the reasons behind that"; and that the defense could not characterize Detective Perry as guilty of criminal conduct.

During Tigue's new trial, the Commonwealth called two witnesses, Lara Mosenthin and Marci Atkins, who are employees of the Kentucky State Police crime lab. Mosenthin provided testimony about the identification value of the strands of hair found at the crime scene. Notably, Mosenthin testified that some of the strands of hair found at the crime scene did not belong to Tigue or Bradshaw's husband and could possibly have been subject to further testing to reveal to whom they belonged. Mosenthin also testified about the clothing fibers found at the Bradshaw residence, stating notably that certain blue fibers were found that had been caught in the splinters of wood from a door. Through

21

examination of Mosenthin and Atkins, Tigue attempted to elicit testimony from them regarding Detective Perry's lack of further investigation of the DNA evidence and results, in addition to trying to show that Kentucky law somehow prohibited Detective Perry from taking certain actions.

Over the course of Tigue's new trial, language was used to describe the destruction of the evidence, such as the evidence being disposed of "as a result of a prior court proceeding" and "as part of that case review process." The Commonwealth in its closing argument stated, "For all the hoopla about where is that evidence, they know just like this detective said, as a result of a prior legal proceeding, the detective disposed of that evidence in a proper way. Some he gave back to the family and the rest had already been tested."

"To make out a due process violation where evidence has been destroyed, the defendant must show (1) that the State acted in bad faith in failing to preserve the evidence; (2) that the exculpatory potential of the evidence was apparent before its destruction; and (3) that the evidence was, to some extent, irreplaceable."[26] "The first two elements are interrelated. It must appear that the State deliberately sought to suppress material, potentially exculpatory evidence."[27]

"[A] missing evidence instruction should be given when material evidence within the exclusive possession and control of a party, or its agents or employees, was lost without explanation or is otherwise unaccountably

---

[26] *McPherson v. Commonwealth*, 360 S.W.3d 207, 217 (Ky. 2012).
[27] *Id.*

22

missing, or was through bad faith, rendered unavailable for review by an opposing party."[28] "When appropriately given, the missing evidence instruction allows the jury, upon finding that the evidence was intentionally and in bad faith destroyed or concealed by the party possessing it, to infer that the evidence, if available, would be adverse to that party or favorable to his opponent."[29] "When it is established that the evidence was lost due to mere negligence or inadvertence, which, in effect, negates a finding of bad faith, the missing instruction should not be given."[30]

Ultimately, the lynchpin for a finding of a due-process violation and the giving of a missing-evidence instruction is a finding of bad faith, or, in the case of a missing-evidence instruction, that the evidence was lost without explanation. Here, there is no question what happened to the evidence, so we must determine whether Detective Perry acted in bad faith when he destroyed the 31 pieces of evidence, some of them possibly having exculpatory value.

Considering the entirety of the factual circumstances, we are constrained to conclude that, at most, Detective Perry was careless in destroying the evidence. We cannot find any fact relayed to us by Tigue that amounts to "the

---

[28] *Ordway v. Commonwealth*, 391 S.W.3d 762, 793 (Ky. 2013).

[29] *Id.* (citing *University Medical Center, Inc. v. Beglin*, 375 S.W.3d 783, 792 (Ky. 2012)).

[30] *Ordway*, 391 S.W.3d at 793 (citing *Beglin*, 375 S.W.3d at 791 (citing *Mann v. Taser Intern., Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009)).

23

State deliberately [seeking] to suppress material, potentially exculpatory evidence"[31] or any "ill motive or intention on the part of the Commonwealth."[32]

No doubt Detective Perry should have been more careful in his handling of the evidence and later disposition of it. But he disposed of the evidence almost two years after he witnessed Tigue plead guilty. True, Tigue attempted to withdraw that guilty plea, which could be argued as an alert to Detective Perry, who was present at that hearing. But it is also true that Tigue did not pursue a direct appeal of the original judgment following the guilty plea, instead attempting pro se collateral attack on the judgment under RCr 11.42 for ineffective assistance of counsel. Under these circumstances, we cannot say that Detective Perry deliberately sought to suppress potentially exculpatory evidence or exhibited any ill will or intention when he disposed of the evidence. Rather, it appears that he simply disposed of evidence, with his sergeant's permission, in a case where a defendant pleaded guilty and did not take a direct appeal almost two years after a hearing in which the trial court denied the defendant's withdrawal of his guilty plea.

Additionally, even assuming Tigue's allegation to be true that Detective Perry violated KSP policies and procedures, in addition to having violated KRS 524.140(3), these circumstances only offer evidentiary support in arguing bad

---

[31] *McPherson v. Commonwealth*, 360 S.W.3d 207, 217 (Ky. 2012).

[32] *Collins v. Commonwealth*, 951 S.W.2d 569, 573 (Ky. 1997).

faith. In other words, these circumstances, in and of themselves, do not equate to bad faith.[33]

This is not to say that the trial court appropriately handled the matter. Although the trial court did not err when it did not dismiss the indictment, suppress any mention of use of the evidence, or offer a missing-evidence instruction, the trial court did abuse its discretion in its handling of the discussion of the evidence at trial before the jury.

As the trial court noted, we made clear in *Estep v. Commonwealth*, that none of the rules limiting when a missing-evidence instruction may be given "precludes a defendant from exploring, commenting on, or arguing inferences from the Commonwealth's failure to . . . preserve . . . evidence. It just means that absent some degree of 'bad faith,' the defendant is not entitled to an instruction that the jury may draw an adverse inference from that failure."[34]

The circumstances involving the handling of the evidence in this case were relevant to Tigue's right to present a defense. The lead detective in Tigue's case ended up destroying possibly exculpatory evidence. Not only is this a relevant fact in assisting Tigue in his defense, but we agree with Tigue's assertion that the Commonwealth's and trial court's characterization of the

---

[33] We can find no support for the proposition that the violation of a statute is per se bad faith entitling the defendant to a missing-evidence instruction. In fact, the Fourth Circuit rejected such an argument in *U.S. v. Varner.*, 261 Fed. Appx. 510, 518 (4th Cir. 2008) ("[E]stablishing a per se rule that would automatically imply bad faith on the part of officers upon violating [a statute] would be imprudent."). Trial courts should consider such fact in their determination as to the giving of a missing evidence instruction.

[34] 64 S.W.3d 805, 810 (Ky. 2002).

matter suggested to the jury that the evidence was properly disposed of, especially the Commonwealth's characterization of the issue in its closing argument.

At the very least, the trial court should have ascertained the merits of Tigue's argument that the evidence was improperly disposed of according to KSP policies and procedures and KRS 524.140. In its order, the trial court refused to take a position on this matter, concluding instead that, "It is not apparent to the Court how suggesting to the jury through cross-examination that Detective Perry violated criminal statutes in destroying or releasing evidence is relevant . . . ." We respect the trial court's attempt to avoid confusing the jury with matters that may appear collateral and irrelevant to the true nature of the case. But preventing an examination of the lead detective in this case about his having destroyed possibly exculpatory evidence in possible violation of Kentucky law, in addition to limiting Tigue's ability to argue this issue to the jury, was erroneous.

While the trial court did not err in refusing to give a missing-evidence instruction, suppress evidence, or dismiss the indictment,[35] we find that the trial court did abuse its discretion in the handling of the characterization of the missing evidence in this case. Tigue should have been allowed to explore the destruction of evidence and argue his point on this matter to the jury.

---

[35] We want to make clear, though, that our ruling is limited to the facts before us at this time. In other words, Tigue is not foreclosed from arguing bad faith on the part of Detective Perry on remand to seek the remedies he advocates here or from arguing any point that might accomplish those remedies.

26

## C. Expert Witness Testimony

Tigue next alleges that the trial court erred when it restricted the testimony of the expert witness that he proffered to testify about the phenomenon of false confessions. This issue is properly preserved for our review. A trial court's determination as to whether to allow expert opinion testimony under KRE 702 is reviewed for an abuse of discretion.[36]

As part of his defense, Tigue sought to introduce the testimony of Dr. Bruce Frumkin, who specializes in, among other things, the phenomenon of false confessions. Dr. Frumkin performed a psychological evaluation of Tigue, in which Dr. Frumkin stated the following in his ultimate report relevant to his potential testimony:

> If I were to testify in court, based on the questions asked of me, I would describe Mr. Tigue's psychological functioning as discussed above, the effects of the drugs he was taking and the withdrawal from them, and the relevancy of all of that to his perceived threat from Mr. Smith combined with the manner of questioning by law enforcement. Depending on the questions posed to me, I could also integrate that data with some of the research on false confessions.
>
> I will not give an opinion as to whether I believe Mr. Tigue likely gave a false confession. That would be inappropriate for me to do so. I will discuss the various factors outlined above so the jury can decide for themselves how much weight to give his statements.

In a 19-page order analyzing the Commonwealth's motion to exclude Dr. Frumkin's testimony from evidence, the trial court concluded the following:

> . . . Dr. Frumkin may not testify as to the phenomenon of false confessions. Consequently, he may not opine as to the Defendant's susceptibility of giving a false confession based upon the presence of psychological factors associated with giving false confessions.

---

[36] *Fugate v. Commonwealth*, 993 S.W.2d 931, 935 (Ky. 1999).

27

Similarly, counsel may not address the phenomenon of false confessions or the Defendant's susceptibility in presenting or arguing to the jury. Defendant may present lay evidence of the physical and psychological environment of his confession . . . and Dr. Frumkin may testify as to the nature of the Defendant's mental condition generally, and as to particular psychological characteristics that in his opinion are relevant to an interrogation setting . . . . Beyond this point, it will be up to counsel to make the point to the jury, to the extent thought necessary, regarding the Defendant's theory that his confession was false. The jury will be free to assess the Defendant's credibility, in confessing or recanting, as it wishes.

Essentially, we must decide whether a criminal defendant may offer evidence under KRE 702 addressing the purportedly scientific phenomenon of false confessions.

KRE 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if: (1) [t]he testimony is based upon sufficient facts or data; (2) [t]he testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

We have dealt with the phenomenon of false confessions before and have seemingly avoided the issue concerning the admissibility of expert testimony on this matter. But a careful review of our relevant decisions suggests that we view expert testimony regarding false convictions as possibly admissible, but in a limited manner.

In *Rogers v. Commonwealth*, we evaluated the trial court's determination of whether an expert could testify as to the phenomenon of false confessions.[37] Although we ultimately ruled that the trial court did not conduct a procedurally appropriate analysis of the matter, we stated in dicta: "*While we believe that at least portions of [the doctor's] excluded testimony would have assisted the trier of fact by providing an explanation for Appellant's 'confession' that would rebut the common assumption that people do not ordinarily make untruthful inculpatory statements,*[38] the trial court's misconstruction of the relevant inquiry meant that it did not evaluate which portions of [the doctor's] testimony would have assisted the jury."[39] We also pointed out that "the United States Supreme Court has taken note of the phenomenon of mentally retarded persons falsely confessing to crimes they did not commit."[40]

In *Tunstull v. Commonwealth*, while we held that the trial court did not abuse its discretion when it denied the defendant funding to hire an expert

---

[37] 86 S.W.3d 29, 42–43 (Ky. 2002).

[38] *See Holloman v. Commonwealth*, 37 S.W.3d 764, 767 (Ky. 2001); *Pritchett v. Commonwealth*, 557 S.E.2d 205, 208 (Va. 2002) (psychiatric testimony connecting mental retardation and false confessions "presented information on subjects unfamiliar to jury that would assist it in determination the reliability of [the defendant's] confession"); *United States v. Shay*, 57 F.3d 126, 129–30 (1st Cir. 1995) (psychiatrist's testimony that defendant suffered from a mental disorder that caused him to make false statements inconsistent with his self-interest "could have 'exploded common myth' about evidence vital to the [prosecution's] case"); *United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996) ("It was precisely because juries are unlikely to know that social scientists and psychologists have identified a personality disorder that will cause individuals to make false confessions that the testimony would have assisted the jury in making its decision.").

[39] *Rogers*, 86 S.W.3d at 42–43.

[40] *Id.*; *Atkins v. Virginia*, 536 U.S. 304, 320 n. 25 (2002).

witness to testify on the phenomenon of false confessions, one of the undeniable reasons for our determination was that "[t]here was no allegation in this case that, for example, Appellant's confession was *unreliable due to a mental condition, that his will had been overcome, or that police made him believe he did something he did not do.*"[41]

And in *Terry v. Commonwealth*, although the issue before us there dealt with proper interpretation of RCr 7.24(3)(B)(i), we commented as it relates to expert testimony regarding false confessions:

> [W]hile Appellant did indeed introduce evidence of the coercive nature of the interrogation (as he testified to this effect) he was precluded from providing an expert to help the trier of fact determine whether his confession was coerced—the essential question presented at trial. We therefore conclude that because the Commonwealth's case was based entirely on Appellant's confession and because his only defense was to call that confession into doubt, the denial of an expert who could provide the context and foundation supporting his position was likely harmful and thus we cannot say the trial court's exclusion of the evidence, based on the avowal, was harmless.[42]

Undoubtedly, courts across the nation have struggled with the admissibility of expert testimony on false confessions.[43] Here, the trial court predicated its conclusion on the fact that it believed Dr. Frumkin's testimony evaluated Tigue's *credibility*, which violated "the general rule against expert testimony going to credibility," the same conclusion that the Tenth Circuit

---

[41] 337 S.W.3d 576, 588 (Ky. 2011).

[42] 332 S.W.3d 56, 63 (Ky. 2010).

[43] *See* Fern L. Kletter, *Admissibility of Expert Testimony Regarding False Confessions*, 11 A.L.R. 7th Art. 6 (originally published in 2016, updated weekly) (citing cases from jurisdictions across the country).

reached in *U.S. v. Benally*.[44] The trial court additionally noted our "long line of Kentucky cases discussing the so-called Child Sexual Abuse Accommodation Syndrome (CSAAS)" and our continuous denial of admitting expert testimony on that subject. Finally, the trial court believed Dr. Frumkin's testimony to be irrelevant under KRE 401 and unduly prejudicial under KRE 403.

Ultimately, the trial court expressed the same concerns that some courts across the nation have expressed in determining whether false-confession expert testimony should be admitted: "Even if Dr. Frumkin does not go so far as to directly voice an opinion as to the truth or falsity of [Tigue's] particular confession, it is inconceivable to the Court that Dr. Frumkin could escape broaching the subject of credibility: the very essence of a testimony that [Tigue] is susceptible of giving a false confession is to indirectly question the veracity of that confession, or, on the other hand, to indirectly vouch for the veracity of [Tigue's] present recantation." The trial court's order and memorandum evidence a feeling of being hamstrung by the current state of the law on the admissibility of false-confession expert witness testimony in general, which, at first glance, suggests a complete and outright prohibition on all semblance of such evidence.

Chief Judge Joseph McKinley of the U.S. District Court of the Western District of Kentucky recently dealt with this issue in an unpublished order in

---

[44] 541 F.3d 990 (10th Cir. 2008) ("[The doctor's] testimony inevitably would 'encroach[] upon the jury's vital and exclusive function to make credibility determinations.'").

31

the case of *U.S. v. Whittle*.[45] We note his discussion of this issue, not for its

mandatory authority, but for its helpfulness to our analysis:

> It is true that many other courts have often permitted false confession expert testimony to explain how a defendant's mental illness or psychological condition rendered the defendant more susceptible to coercion or persuasion.[46]
>
> However, courts have admitted testimony on false confessions and police interrogation techniques because this expert testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."[47] In fact, information regarding false confessions has been deemed extremely helpful for jurors because "a common misperception among the public is that once a person confesses to his guilt, he must be guilty."[48] Properly conducted social science research often shows that commonly held beliefs are in error.[49] "The phenomenon of false confessions and the factors tending to produce such confessions is an area that is beyond the common experience of the ordinary person. Similar to the areas of battered woman's syndrome[50] and eyewitness identification,[51] in which expert testimony is offered to disabuse the jury of certain assumptions about human behavior, expert testimony regarding false confessions can serve to refute the commonly held notion that people do not confess to crimes they did not commit."[52]
>
> Specifically, expert testimony regarding false confessions "challenges this perception based on systematic observation of

---

[45] 3:13–CV–00170–JHM, 2016 WL 4433685 (W.D. Ky. Aug. 18, 2016).

[46] *U.S. v. Deuman*, 892 F.Supp.2d 881, 887 (W.D. Mich. 2012); *see U.S. v. Hall*, 93 F.3d 1337 (7th Cir. 1996); *U.S. v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995); *State v. Oliver*, 124 P.3d 493, 506 (Kan. 2005); *State v. Pate*, No. M2009–02321–CCA–R3–CD, 2011 WL 6935329, *12 (Tenn. Crim. App. Nov. 22, 2011).

[47] FRE 702.

[48] *U.S. v. Hall*, 974 F.Supp. 1198, 1206 (C.D. Ill 1997).

[49] *Hall*, 93 F.3d at 1345.

[50] *People v. Humphrey*, 921 P.2d 1, 3 (Cal. 1996).

[51] *People v. McDonald*, 690 P.2d 709, 719–20 (Cal. 1984) (overruled on other grounds by *People v. Mendoza*, 4 P.3d 265 (Cal. 2000)).

[52] *Cason v. Hedgpeth*, No. CV 08-4576-JVS (RNB), 2009 WL 1096209, *11 (C.D. Cal. Apr. 22, 2009).

data to which the jury is not privy."[53] This testimony is important because it informs the jury "that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fits the facts of the case being tried."[54] Accordingly, many courts have permitted expert witnesses to testify regarding the risk of a false confession when certain factors are beyond a layperson's typical scope of knowledge.[55]

The Court agrees that the defendant should be able to proffer a psychological expert to explain to the jury that some defendants give, for whatever reason, false confessions to a crime, and that Defendant has psychological traits that make it possible that he would give a false confession. [The doctor] has identified potential mental and psychological conditions along with several environmental stressors (sleep deprivation, drug and alcohol use and withdrawal, unrelated emotional distress, etc.) that may have caused Defendant to have been mentally compromised or more susceptible to giving a false confession to law enforcement. How these factors could influence a false confession are well beyond the purview of a layperson; therefore, [the doctor's] testimony would be helpful to the jury.

Moreover, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."[56] As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[57] Here, many of the Government's objections to [the doctor's] testimony can be explored and challenged during cross-examination . . . .

Though the Court is willing to admit [the doctor's] testimony, the Court will not, as apparently any court will not, allow [the doctor] to opine as to whether Defendant gave a false confession. Drawing

---

[53] *Hall*, 974 F.Supp. at 1206.

[54] *Hall*, 93 F.3d at 1345.

[55] *See Lunbery v. Hornbeak*, 605 F.3d 754, 760 (9th Cir. 2010) (Hawkins, J. concurring); *Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381, *2 (N.D. Ill. May 10, 2013); *Boyer v. State*, 825 So.2d 418, 420 (Fla. Dist. Ct. App. 2002), *cf. People v. Page*, 2 Cal. App. 4th 161, 181–183 (Cal. 1991).

[56] FRE 702, advisory committee's note (2000 amendments).

[57] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

this line prevents [the doctor] from invading the province of the jury, provides relevant and useful information to lay members of the jury, and does not allow [the doctor] to offer testimony on the credibility of Defendant. It simply gives the jury the tools to make an informed decision about false confessions, which appear to actually occur. The public may not be aware of false confessions as much as those individuals in the criminal justice system, and the expert could provide valuable insight necessary to assure Defendant's Sixth Amendment right to present a complete defense.[58] The Court believes, particularly with careful limiting instructions, that a jury could distinguish between information about psychologists' beliefs about false confessions and whether Defendant falsely confessed through their own credibility determinations.

. . . [The doctor] will not opine that Defendant's statements should be disregarded as false. Many courts that disallow false confession expert testimony take issue with the fact that "the prejudice to the prosecution that would result from permitting an expert to opine that prior confessions should essentially be disregarded because they are just as likely to be true as untrue" and that this prejudice "substantially outweighs the testimony's minimal probative value."[59] However, [the doctor] will be limited to explaining to the jury the interrogation techniques and tactics used by law enforcement, Defendant's mental and psychological issues, and how the two relate. The determination of falsity of the confession will ultimately be left to the jury....

Accordingly, the Court will allow Defendant to introduce [the doctor's] expert testimony regarding false confessions and police interrogation tactics but will limit that testimony by prohibiting her from making a determination as to whether Defendant actually made a false confession to law enforcement.[60]

Chief Judge McKinley's rational is persuasive. Moreover, "[i]t has been held that though expert testimony regarding the phenomenon of false confessions would not be appropriate in every case, when relevant indicia are present, and

---

[58] *See generally Crane v. Kentucky*, 476 U.S. 683, 684 (1986).

[59] *U.S. v. Benally*, 541 F.3d 990, 995 (10th Cir. 2008); *see U.S. v. Deuman*, 892 F.Supp.2d 881, 890–91 (W.D. Mich. 2012).

[60] *Whittle*, 2016 WL 4433685, *3–5.

34

the proffered testimony is reliable, a defendant should be allowed to present expert testimony on the subject."[61] Some courts have held outright that the exclusion of false confession expert testimony is error;[62] some courts found error in the exclusion of false-confession expert testimony on the specific case before the court;[63] and some courts have held that false-confession expert testimony is "potentially" admissible.[64]

After the Tenth Circuit's decision in *Benally*, U.S. District Court Judge James Browning begrudgingly accepted its decision in *U.S. v. Ganadonegro*.[65] Responding to the argument that admission of false-confession expert testimony is improper because it invades the jury's province of judging the credibility of witnesses, Judge Browning stated:

> On a clean slate, the Court might be inclined to draw the same line that the Seventh Circuit drew in *U.S. v. Hall* and that the First Circuit drew in *U.S. v. Shay*. In other words, the Court agrees that the defendant should be able to proffer a psychological expert to explain to the jury that some defendants give, for whatever reason,

---

[61] Kletter, *supra* note 43.

[62] *State v. Perea*, 322 P.3d 624 (Utah 2013); *McCloud v. State*, 208 So.3d 668 (Fla. 2016); *Jimerson v. State*, 56 N.E.3d 117 (Ind. App. 2016).

[63] *U.S. v. Dougherty*, NMCCA 201300060, 2013 WL 6858964 (N.M.C.C.A. 2013) (rev. denied, 73 M.J. 451 (C.A.A.F. 2014); *People v. Lucas*, No. C057593, 2009 WL 2049984 (Cal. App. 2009); *People v. Cason*, No. B187189, 2008 WL 891292 (Cal. App. 2007); *Boyer v. State*, 825 So.2d 418 (Fla. App. 2002); *State v. Lansford*, 310 P.3d 1079 (Kan. App. 2013); *State v. Hreha*, 89 A.3d 1223 (N.J. 2014); *State v. Granskie*, 77 A.3d 505 (N.J. App. 2013);

[64] *U.S. v. Belyea*, 159 Fed. Appx. 525 (4th Cir. 2005); *U.S. v. Hall*, 93 F.3d 1337 (7th Cir. 1996); *U.S. v. Ganadonegro*, 805 F.Supp.2d 1188 (D.N.M. 2011); *U.S. v. McGinnis*, ARMY 20071204, 2010 WL 3931494 (A.C.C.A. 2010); *Commonwealth v. Hoose*, 5 N.E.3d 843 (Mass. 2014); *People v. Kowalski*, 821 N.W.2d 14 (Mich. 2012); *Brant v. State*, 340 P.3d 576 (Nev. 2014); *People v. Bedessie*, 970 N.E.2d 380 (N.Y. 2012); *People v. Evans*, 141 A.D.3d 120 (N.Y. App. 2016); *State v. Stringham*, No. 2002–CA–9, 2003 WL 950957 (Ohio App. 2003); *State v. Baldwin*, 482 S.E.2d 1 (N.C. App. 1997).

[65] 805 F.Supp.2d 1188 (D.N.M. 2011).

false confessions to a crime, and that the defendant has psychological traits that make it possible that he would give a false confession. The Court would not, as apparently any court would not, allow the expert to say a particular defendant gave a false confession. The Court believes that this line prevents the expert from invading the province of the jury, provides relevant and useful information to a lay jury, and does not allow the expert to offer testimony on the credibility of the defendant. It simply gives the jury the tools to make an informed decision about false confessions, which appear to actually occur. The public may not be aware of false confessions as much as those individuals in the criminal justice system, and the expert could provide valuable insight necessary to assure the defendant's Sixth Amendment right to present a defense. The Court believes, particularly with careful limiting instructions, that a jury could distinguish between information about the psychology profession's beliefs about false confessions, and the limits on the expert's opinion as to what a particular defendant did. Jurors are pretty smart, and the Court's experience is that they routinely ignore experts and make their own credibility determinations.[66]

Lastly, in considering whether a defendant should be able to rebut the making of a confession with expert testimony regarding false confessions, we are reminded of the impact evidence of a confession has on the jury: "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."[67]

---

[66] *Id.* at 1212.

[67] *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. U.S.*, 391 U.S. 123, 139–40 (1968) (White, J., dissenting)).

Because our case law shows a tendency to support the admissibility of such expert opinion evidence; because we agree with Chief Judge McKinley's, Judge Browning's, and other courts' reasoning as to why false-confession expert testimony should not automatically be inadmissible, and because of the undeniable impact evidence of a confession can have on a jury, we hold that the trial court abused its discretion when it restricted the admissibility of Dr. Frumkin's testimony because it believed the current state of the law outright prohibited such testimony.

Our conclusion is not a statement that false-confession expert testimony is always admissible. The more accurate statement of our holding here is that false-confession expert testimony is not always inadmissible. It appears that the trial court in this case felt compelled into characterizing Dr. Frumkin's testimony as inadmissible because of its analysis of the current state of the law on this issue. On remand, the trial court should reevaluate Dr. Frumkin's testimony considering the analysis provided in this opinion and the considerations that Justice Cunningham has outlined in his concurring opinion in this case and redetermine its admissibility under KRE 702, 401, and 403.[68]

## D. Competency Evaluation

Tigue next argues that the trial court erred when it failed to conduct a competency hearing to determine if Tigue was fit to stand trial after he

---

[68] Again, our conclusion is not that the trial court must admit the entirety or a portion of Dr. Frumkin's testimony. We are simply concluding that the trial court erred when it excluded Dr. Frumkin's testimony for the reasons it did.

attempted suicide while in prison. We find Tigue's argument meritless for the reasons stated below.

After Tigue's suicide attempt, which took place approximately one month before the new trial, Tigue was taken to the hospital, where he indicated he was still suicidal. Upon his release from the hospital, he was deemed a high risk for suicide and placed on suicide watch in prison.

Two weeks later, the Commonwealth initiated the trial court's review of Tigue's mental fitness. However, we note the conversation that took place between Tigue and the trial court after the Commonwealth raised the issue:

> Tigue: If I may respond. I want to respond to all those things that [the Commonwealth] said. I just want to speak on my behalf. There's no doubt that I'm competent . . .
>
> Trial Court: . . . Would you like to address the [competency] concerns of the Commonwealth?
>
> Tigue: Yeah, I do want to address them insofar as there's no question as to my competency. . .
>
> Tigue's Counsel: Judge, we would object to any competency evaluation to take place. Obviously, as counsel, if we thought there was an issue, we would raise it at this point . . . . We would object to any competency hearing in an attempt apparently to continue this trial . . . . Judge, again, I'm not a professional here, but if I felt there was an issue, I would have raised it."

Even so, the trial court nonetheless conducted a hearing regarding Tigue's competency, calling as a witness the jailer working during Tigue's suicide attempt to question him about Tigue's mental fitness. Tigue argues that the trial court's failure to order a competency evaluation and conduct a true competency hearing amount to an abuse of discretion.

"KRS 504.100(1) requires the court to order a competency examination upon 'reasonable grounds to believe the defendant is incompetent to stand trial.'"[69] "It is within the trial court's discretion to determine whether there are 'reasonable grounds' to believe a defendant may be incompetent to stand trial."[70] "However, once facts known to the trial court are sufficient to place a defendant's competency at issue, an evaluation and evidentiary hearing are mandatory."[71]

In *Padgett*, this Court identified that there is both a constitutional and statutory right to a competency hearing.[72] "If there is substantial evidence that a defendant is incompetent, and thus the constitutional right to a hearing attaches, the trial court must conduct a competency hearing . . . even if both counsel and the defendant expressly waive it."[73] But, "if there are not substantial grounds to believe the defendant is incompetent, only the statutory right[74] has attached. And because any statutory right can be waived, there would be no error if the trial court declined to hold a hearing upon a valid waiver . . .."[75]

---

[69] *Padgett v. Commonwealth*, 312 S.W.3d 336, 344 (Ky. 2010) (quoting KRS 504.100(1)).

[70] *Slone v. Commonwealth*, 382 S.W.3d 851, 859 (Ky. 2012) (quoting *Bishop v. Caudill*, 118 S.W.3d 159, 161 (Ky. 2003)).

[71] *Id.*; *Gray v. Commonwealth*, 233 S.W.3d 715, 718 (Ky. 2007).

[72] 312 S.W.3d at 348.

[73] *Id.*

[74] *See* KRS 504.100(3) ("After the filing of a report . . . the court shall hold a hearing to determine whether or not the defendant is competent.").

[75] *Id.*

In this case, the only argument that Tigue makes on this point is that the suicide attempt, in and of itself, should have prompted a competency evaluation, and further, a true competency hearing, not just a hearing involving the testimony of a jailer. But we cannot say that the trial court erred in any respect. The trial court heard vehement rejection from Tigue and his counsel as to any challenge regarding his competency. The trial court heard testimony from a jailer, in addition to its own observations of Tigue's behavior on multiple occasions, which did not appear to call into question Tigue's competency.

The jailer testified that Tigue attempted suicide because the prison refused to allow him to be put in with the general population. The jailer additionally testified that Tigue was upset because of a delay in obtaining his medication, to which Tigue reacted negatively and argued that Tigue's slitting of his wrists should be viewed more as Tigue's way of getting to see a doctor than a suicide attempt. And, as the Commonwealth points out, Tigue acted as hybrid counsel at trial, conducting an evidentiary hearing and arguing recusal motions on the same day that a challenge to his competency was made.

A defendant's attempt at suicide is a serious matter and trial courts should not treat the act lightly. But this suicide attempt was the only purported evidence of an issue with Tigue's competency. A suicide attempt, in and of itself, when viewed in conjunction with the defendant's and his counsel's contemporaneous and vehement denial of any issue regarding competency; affirmative indications that the defendant is competent, including

the ability to perform effectively as hybrid counsel; and no other reason to call into question the defendant's competency after trial court observation, cannot amount to error on the part of trial court for having not ordered a competency evaluation or conducted a true competency hearing. Tigue himself admitted in his brief, "[i]t may be true a suicide attempt in the wake of criminal charges does not automatically equate to incapacity to stand trial . . . ."

For these reasons, the trial court did not err when it did not order a competency evaluation or conduct a competency hearing.

### E. Suppression of Confession

Tigue argues next that the trial court erred when it denied his motion to suppress his confession. That this issue is preserved for our review is undisputed.

It appears that Tigue has challenged the admissibility of his confession both on Fifth and Fourteenth Amendment to the U.S. Constitution grounds. Tigue alleges that the waiver of his *Miranda* rights[76] was not done voluntarily, knowingly, or intelligently, and that the confession was the product of police coercion. Lastly, Tigue argues that the trial court erred when it failed to consider certain evidence, specifically a report generated by Tigue's expert witness that provided the trial court with purportedly new information concerning his confession.

---

[76] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

"Appellate review of a trial court order on a suppression motion involves a two-step analysis.[77] First, the factual findings of the trial court are conclusive if supported by substantial evidence.[78] Second, if the findings are supported by substantial evidence, the appellate court conducts a de novo review to determine whether the trial court's ruling is correct as a matter of law.[79]"[80]

To start, Tigue's Fifth Amendment argument is meritless. It is undisputed that Tigue, himself, asked to speak with Detective Perry, thereby initiating the conversation with law enforcement. "To determine . . . if the accused has waived the right to counsel after initiating conversation, the court must determine whether (1) the inquiries or statements were intended to initiate a conversation with authorities and (2) there was a waiver of the right to counsel which was voluntary, knowing, and intelligent given the totality of the circumstances."[81]

Tigue does not dispute that he initiated the conversation with Detective Perry. Rather, Tigue claims that the circumstances he was subjected to while housed in his jail cell, coupled with his purported intoxication, rendered his statements involuntarily, unknowingly, and unintelligently given. Specifically, Tigue claims that the jailers were inattentive to his basic needs, that he was

---

[77] *Commonwealth v. Whitmore*, 92 S.W.3d 76 (Ky. 2002).

[78] *Id*; RCr 9.78.

[79] *Whitmore*, 92 S.W.3d at 79.

[80] *Anderson v. Commonwealth*, 352 S.W.3d 577, 583 (Ky. 2011).

[81] *Cummings v. Commonwealth*, 226 S.W.3d 62, 66 (Ky. 2007) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983)).

intoxicated and detoxing over the course of his 24-hour jail stay, and that he was denied the ability to contact his family, as he wanted to specifically warn them of the alleged threat of Danny Smith. All these reasons, Tigue claims, contributed to his decision to tell police whatever they wanted to hear and prompting him to initiate the conversation with police and waive his *Miranda* rights.

We give due credence to Tigue's statements given under oath, but we find that the trial court's factual findings in this case are supported by substantial evidence. Trial testimony revealed that Tigue was allowed one phone call, per jail policy, but Detective Perry requested that Tigue not be allowed to call his wife or other family, as Perry had not yet interviewed these individuals and he did not want Tigue to influence their statements. Trial testimony also revealed that jail staff took Tigue to buy snacks and sundries.

Lastly, the main rationale upon which Tigue predicates his argument on is that he confessed to the crime to prevent Danny Smith from taking violent action against Tigue's family. Not only did Tigue never relay this information to police,[82] but this rationale has no bearing on the propriety of Tigue's confession. "The sole concern of the Fifth Amendment, on which *Miranda* was based, is *governmental coercion*."[83] "Indeed, the Fifth Amendment privilege is

---

[82] While Tigue did implicate Smith, he never relayed to officers that he feared for his family members' lives because of the potential threat Smith posed.

[83] *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citing *United States v. Washington*, 431 U.S. 181, 187 (1977); *Miranda*, 384 U.S. at 460) (emphasis added).

not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion."[84]

The only governmental coercion, the crux of the Fifth Amendment protection, that Tigue alleges occurred is the conditions to which he was subjected while housed in prison. But much of Tigue's factual claims on this point are refuted by the testimony of a jailer caring for Tigue at the time. Additionally, a review of Tigue's confession, coupled with his own initiation of the interview itself, reveals support for the trial court's conclusion that the confession was made voluntarily, knowingly, and intelligently. Tigue coherently articulated in detail what he purportedly did, seemingly showing no signs of intoxication or withdrawal effects.

For these same reasons, we find Tigue's Fourteenth Amendment argument meritless, as well. "The Due Process Clause of the Fourteenth Amendment prohibits the admission of involuntary confessions[] '[if the defendant's] will has been overborne and his capacity for self-determination critically impaired . . . .'"[85] "The voluntariness of a confession is assessed based on the totality of the circumstances surrounding the making of the confession."[86] Invoking the Fourteenth Amendment's protection was the same government-coercion nexus as invoking the Fifth Amendment's protection:

---

[84] *Connelly*, 479 U.S. at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985)).

[85] *Dye v. Commonwealth*, 411 S.W.3d 227, 232 (Ky. 2013) (quoting *Bailey v. Commonwealth*, 194 S.W.3d 296, 300 (Ky. 2006) (quoting *Sckneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)).

[86] *Dye*, 411 S.W.3d at 232 (quoting *Bailey*, 194 S.W.3d at 300) (quoting *Mills v. Commonwealth*, 996 S.W.2d 473, 481 (Ky. 1999)).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment."[87] "The three criteria used to assess voluntariness are 1) whether the police activity was 'objectively coercive;' 2) whether the coercion overbore the will of the defendant; and 3) whether the defendant showed that the coercive police activity was the 'crucial motivating factor' behind the defendant's confession."[88]

Tigue alleges that his jail conditions constitute implied coercion, but his factual basis for this conclusion is lacking, considering the testimony of the jailer responsible for his care. And Tigue has not alleged any other purportedly coercive acts by the police. After review of the record, we cannot find "objectively coercive" acts by the police in prompting Tigue's confession. It is difficult to say that any purported police activity was the "crucial motivating factor behind [Tigue's] confession," because Tigue, himself, argues that the fear of what Smith was going to do to his family was one of the motivating factors, if not the primary motivating factor, playing into his decision to confess. This has nothing to do with police coercion.[89]

---

[87] *Dye*, 411 S.W.3d at 232 (quoting *Bailey*, 194 S.W.3d at 300) (quoting *Connelly*, 479 U.S. at 167)).

[88] *Dye*, 411 S.W.3d at 232 (quoting *Henson v. Commonwealth*, 20 S.W.3d 466, 469 (Ky. 1999) (citing *Morgan v. Commonwealth*, 809 S.W.2d 704, 707 (Ky. 1991)).

[89] If Tigue's assertion is that police prohibited him from reaching his family, knowing he would give in to the pressure of fearing for their lives, thereby implicitly coercively rendering his confession, we find this argument meritless, as well. There is no indication that Tigue ever relayed to police his fear that Smith would harm his family. And, we decline to entertain such an accusation of nefarious police conduct without any evidence supporting such an accusation.

Tigue also alleged that his purported intoxication and his suffering from withdrawal calls into question the voluntariness of his statements. "An otherwise voluntary statement will not be excluded on the basis of intoxication unless the accused is 'intoxicated to the degree of mania, or of being unable to understand the meaning of his statements . . . .'"[90] As previously stated, a review of the confession reveals support for the conclusion that Tigue does not evidence such conditions in any way, thereby rendering his confession voluntary.

Lastly, we have already determined that the trial court should have considered the testimony of Dr. Frumkin in general, which would have shed light on the general nature of Tigue's confession. In this specific instance, the trial court stated in its initial decision denying Tigue's suppression motion, "[T]he Court did not receive testimony from any expert as to the abuse of Xanax, the effects of various dosages, the consequences of abuse, and the nature and course of withdrawal from Xanax; in short, as to how a day's abstinence from Xanax with the Defendant's history would likely affect one's mental state." Tigue then filed a pro se suppression motion which purportedly included testimony from Dr. Frumkin that would have refuted this exact point. The trial court denied Tigue's hearing, stating that "the greater portion" of the motion concerned arguments already addressed by the court in its prior ruling.

---

[90] *Anderson v. Commonwealth,* 352 S.W.3d 577, 583 (Ky. 2011) (quoting *Britt v. Commonwealth,* 512 S.W.2d 496 (Ky. 1974)).

46

A review of Dr. Frumkin's report that Tigue cited in support of his assertion reveals that Dr. Frumkin would have testified about "Tigue's psychological functioning, . . . the effects of the drugs he was taking and the withdrawal from them, and the relevancy of all of that to his perceived threat from . . . Smith combined with the manner of questioning by law enforcement." Simply put, this evidence bears on the voluntariness of the statements Tigue made. In fact, this evidence refutes the trial court's original rationale for why it rendered the confession voluntary. Therefore, the trial court erred when it refused to consider this evidence in determining whether Tigue's confession was indeed made voluntarily.

## F. Exclusion of Statements

Lastly, Tigue argues that the trial court erred when it prevented Tigue from testifying about what Danny Smith told him the day of the events in question. That this issue is preserved for our review is undisputed.

Specifically, Tigue argues that he was not able to relay to the jury what Smith told him to do while they were inside the Bradshaw home, where Smith told Tigue to drive after they left the Bradshaw home, and what Smith would do if Tigue did not help him. The Commonwealth objected to these statements as inadmissible hearsay, and the trial court sustained the objection. We review this alleged error under an abuse of discretion standard.[91]

---

[91] *Moss v. Commonwealth*, 531 S.W.3d 479, 484 (Ky. 2017); *Lopez v. Commonwealth*, 459 S.W.3d 867, 872–73 (Ky. 2015).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[92] *"[O]rders[] and threats are not hearsay.*[93] '[T]hey are not declarations of fact and therefore are not capable of being true or false.'[94] In essence, such 'statements' contain no assertion. They, therefore, are not offered to prove the matter asserted and are not hearsay."[95] Therefore, the trial court erred when it did not allow Tigue to testify as to what Smith ordered him to do and that Smith threatened to harm his family.

## G. Tigue's murder conviction must be reversed, but his other convictions will be affirmed[96]

We have identified several errors on the part of the trial court in this case: the testimony of Billie Storms should have been excluded; the trial court did not appropriately handle the characterization of the missing evidence; the trial court erred when it outright excluded Dr. Frumkin's testimony regarding the phenomenon of false confessions and the impact Tigue's condition had on

---

[92] KRE 801(c).

[93] *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999); *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006)).

[94] *United States v. Reilly*, 33 F.3d 1396, 1410 (3d Cir. 1994) (quoting Graham, *Federal Practice and Procedure: Evidence* § 6705 at 409).

[95] *Daugherty v. Commonwealth*, 467 S.W.3d 222, 233 (Ky. 2015).

[96] Tigue has also raised for our review the trial court's denial of his for-cause challenges against some members of the venire. Specifically, Tigue argues that the trial court should have struck some of the members of the venire for their alleged inability to consider the full range of penalties and mitigating factors during the sentencing phase. Because we reverse Tigue's murder conviction, and because Tigue and the Commonwealth agreed to sentences on the remaining convictions, we find this issue irrelevant. Whether the trial court erred in this respect no longer has any bearing on Tigue's case, so we decline to reach this issue.

48

his confession; and Danny Smith's statements did not constitute inadmissible hearsay. These errors can be separated into those that affect the propriety of Tigue's murder conviction and those that do not.[97]

As it relates to the errors that affect all of Tigue's convictions, excluding his first-degree murder conviction, we can say without a doubt that they constitute harmless error.

"No error in . . . the admission . . . of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice."[98] "The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties."[99] "[A] nonconstitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error."[100] "[T]he inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is

---

[97] Recall that Tigue was convicted of first-degree murder, first-degree burglary, second-degree possession of a controlled substance, third-degree possession of a controlled substance, and possession of a controlled substance not in its original container.

[98] RCr 9.24.

[99] *Id.*

[100] *Murray v. Commonwealth*, 399 S.W.3d 398, 404 (Ky. 2013) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)).

rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."[101]

The main reason for our view that the propriety of Tigue's convictions—other than his murder conviction—are not affected by the errors he alleged at trial is that Tigue has not presented any argument that they do. Tigue does not dispute in any way the fact that he was in possession of illegal drugs. And he readily admits, as part of his defense, that he entered the Bradshaw residence to help Smith clean up the effects of Smith's purported initial entry and commission of the murder. Tigue also admits that he assisted in the taking of items from the Bradshaw residence, including the disposition of Bradshaw's husband's shotgun:

> A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime: (a) [i]s armed with explosives or a deadly weapon; (b) [c]auses physical injury to any person who is not a participant in the crime; or (c) uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.[102]

"If a burglar arms himself at any time while in immediate flight from the dwelling he may be convicted of first-degree burglary."[103] In sum, Tigue does not challenge the propriety of any of his convictions except his murder conviction.

---

[101] *Murray*, 299 S.W.3d at 404 (quoting *Kotteakos*, 328 U.S. at 765).

[102] KRS 511.020(1).

[103] *Baker v. Commonwealth*, 860 S.W.2d 760, 762 (Ky. 1993).

But we find that the trial court's errors do affect the propriety of Tigue's murder conviction[104] and mandate reversal of this conviction. The Commonwealth has not identified much evidence implicating Tigue on this charge apart from his confession and Tigue's possession of the shotgun. The propriety of Tigue's confession has been called into doubt by expert-witness testimony that was excluded from the ears of the jury. Tigue was unable to, beyond the testimony of the KSP witnesses, further explore the possible exculpatory nature of the evidence that Detective Perry destroyed and was curtailed in his attempt to argue on that matter by the trial court. Lastly, the trial court prevented Tigue from relaying purported orders and threats that Danny Smith gave him, erroneously referring to them as "hearsay."

### IV.CONCLUSION.

We must reverse so much of the final judgment as reflects Tigue's murder conviction and resulting sentence. The judgment of conviction and sentence for the other crimes stand. Accordingly, we remand this case to the trial court for entry of a new judgment and further proceedings consistent with this opinion.

All sitting. Minton, C.J.; Hughes, Keller, VanMeter and Venters, JJ., concur. Cunningham, J., concurs in result only by separate opinion, in which Wright, J., joins.

---

[104] The trial court's admission of Billie Storms's testimony had nothing to do with Tigue's murder conviction, but rather Tigue's burglary conviction.

CUNNINGHAM, J., CONCURRING IN RESULT ONLY:   Respectfully, I concur in result only.

Involuntary confession experts may be essential to a defendant's attack upon an involuntary or *coerced* confession. The whole science of this expertise is anchored in the concept that people will sometimes confess to something they did not do because of physical or mental suffering during the interrogation process.  In such cases, the severe stress is imposed upon the subject due to abuse at the hands of the interrogators.  The subject's will to resist is broken down, but not because of the need to admit to committing the crime or because of good, hard-hitting questions—it is broken down by torture.

"[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). One example is when the police obtain a confession by whipping the defendant. *See, e.g., Dickson v. Commonwealth*, 275 S.W. 805 (Ky. 1925).  Other drastic measures include when the police leave the defendant in an interrogation room for hours on end—without food, water, restroom breaks, or sleep—until his or her will is finally broken.  In such cases, the courts are obligated to protect defendants in police custody from coercive interrogation tactics meant to torment or trick the accused into involuntarily offering a confession in order to bring the agonizing interrogation to an end.  Most especially, when it is a false confession to a crime they did not commit.

Additionally, the courts have recognized that false confession experts may be appropriate to explain how a defendant's age, mental capacity, or personality trait may make the defendant unusually susceptible to being pressured or persuaded to give false testimony. *See Rogers v. Commonwealth*, 86 S.W.3d 29, 42-43 (Ky. 2002); *see also U.S. v. Deuman*, 892 F.Supp.2d 881, 887 (W.D. Mich. 2012). To that end, I concur with the majority that expert testimony regarding false confessions is sometimes admissible, but in a very limited manner.

However, the case at bar was not a case of coerced confession. Tigue was in control of the confession. Within thirty minutes after Detective Perry left, Tigue requested that the detective return and volunteered a confession. With striking detail, he described the robbery and killing of his victim.

At no point did Tigue suggest that the interrogation was coercive. Nor did he suggest that he was unusually susceptible to making a false confession. According to him, it was a fake confession, not an involuntary one. He never asserted a defense of involuntariness. Therefore, what purpose would a confession expert serve in this case?

As this Court emphasized in *Tunstull v. Commonwealth*, 337 S.W.3d 576 (Ky. 2011), there is stark contrast between the need for a confession expert in cases of coercive interrogation as opposed to cases where a defendant has simply lied of his or her own volition. This Court articulated that, differing from a claim of involuntary or coerced confession:

> the allegation was that Appellant *made a conscious decision* to falsely confess, in order to protect his cousin. The trial court did

53

not believe that an expert was necessary to explain this concept to the jury . . . Appellant's claim was simply that he falsely confessed to protect others. We agree with the trial court that *the jury was fully equipped to evaluate Appellant's claim,* and that there was no reasonable necessity for an expert. In his testimony, Appellant intelligently and clearly articulated his reasons for making what he claimed was a false confession . . . No abuse of discretion occurred.

*Tunstull,* 337 S.W.3d at 587-88 (emphasis added).

Although *Tunstull* dealt specifically with the trial court's denial of funds to pay for a false confession expert, it is directly on point with the issue of a defendant's false confession. The *Tunstull* court held that a defendant who knowingly and willfully lies in confession is not entitled to an expert to describe his decision to lie. Rather, the defendant himself can give the jury an adequate description of the reasons for which he lied to investigators.

Here, both sides agree that law enforcement acted properly and in full compliance with all professional and constitutional standards. There was no torture. There was no sweating. There was no coercion. In Tigue's best pitch, he invited the detective to come and take down his written lie to protect his family. It was a proactive and aggressive tactic by Tigue, totally devoid of any breakdown of will.

For obvious reasons we must be very selective of which we will allow expert opinions on allegedly false confessions. The newly-evolving false confessions evidence rule should be restricted to involuntary confessions.

I applaud the statement of the Chief Justice. "Our conclusion is not a blanket statement that false-confession expert testimony is always admissible."

54

I write simply to emphasize that point. In my opinion, this should not be interpreted to open wide the gate to using it in all criminal cases where confessions—and even admissions—are introduced as evidence.

The more problematic dilemma in this case is the majority's treatment of the KRE 404(b) issue. This matter turned into a procedural can of worms at the trial court level, which ultimately led to reversible error.

The evidentiary issue was this: the Commonwealth wished to call Tigue's mother, Fay Neal, to either admit or deny a statement she made the day of the murder. Neal was sitting with Juanita, the bedridden mother of Billie Storms, one morning at Storms' residence so that Storms could have a medical procedure. According to Storms, when she returned to the residence, Neal told her that Tigue had attempted to break into Juanita's room while Storms was away. The Commonwealth wanted to introduce this statement under KRE 404(b) to show modus operandi. In my opinion, we do not need to address that issue. The trial court prohibited the substantive use of Storms' testimony because it was not revealed to the defense until the eve of trial. As such, the trial court ruled that Storms would only be allowed to testify to impeach Neal's testimony.

Most assuredly, the trial court anticipated that Neal would be a witness for the defense, not the Commonwealth. That is the only way it would make sense. Because of the trial judge's ruling, the Commonwealth would not be allowed to introduce the evidence of the inconsistent statement in its case-in-chief. However, if the defense had called Neal and she denied making the

statement, then Storms could impeach Neal. That keeps with the rationale of *Harris v. New York*, 401 U.S. 222 (1971), and *Walder v. U.S.*, 347 U.S. 62 (1954), where the U.S. Supreme Court ruled that it was permissible for otherwise inadmissible evidence to be used for impeachment.

Otherwise, it is not clear exactly how Storms' statement could be used for impeachment without Neal being called as a witness.

Instead, the Commonwealth called Neal in its case-in-chief and laid the foundation for the impeachment on its own. This violated the court's pre-trial ruling. During direct examination, Neal denied making the statement. Storms was not called as part of the Commonwealth's case-in-chief. So, the damning evidence was not part of the Commonwealth's case.

The defense then presented its case and closed. Thereafter, over strenuous objection from the defendant, the trial court allowed the Commonwealth to present Storms' testimony in rebuttal, right before the jury was instructed.

The rebuttal testimony of Billie Storms did not rebut anything in the defendant's case. Thus, it was improperly introduced in what amounted to the Commonwealth putting on additional proof. The fact that this rebuttal testimony was permitted in defiance of the trial court's order only added to the subterfuge of the trial court's pre-trial ruling.

The trial court had obviously determined that the late revelation of the information made it worthy of exclusion. In so doing, it must have determined that unless used in the method directed, it would be prejudicial to Tigue's case.

56

Consequently, the Commonwealth's subverting of that court's ruling cannot be deemed harmless. Therefore, I concur in finding reversible error in the handling of the KRE 404(b) evidence but not for the same reasoning as the majority.

For the foregoing reasons, I concur in result only.

Wright, J., joins.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Emily Holt Rhorer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Leilani K.M. Martin
Assistant Attorney General

# Supreme Court of Kentucky

## 2017-SC-000156-MR

SHAWN TIGUE                                                    APPELLANT

                  ON APPEAL FROM BELL CIRCUIT COURT
V.                 HONORABLE ROBERT COSTANZO, JUDGE
                        NO. 03-CR-00082

COMMONWEALTH OF KENTUCKY                                APPELLEE

## ORDER DENYING PETITION FOR MODIFICATION
## BUT MODIFYING ON THE COURT'S OWN MOTION

The Petition for Modification, filed by the Appellant, of the Opinion of the Court, rendered November 1, 2018, is DENIED. The Opinion of the Court is MODIFIED on the Court's own motion by substitution of the attached Opinion in lieu of the original. Said modification does not affect the holding of the Opinion as originally rendered.

Minton, C.J.; Hughes, Keller, Lambert, VanMeter and Wright, JJ., sitting. All concur.

ENTERED: March 14, 2019.

_____
CHIEF JUSTICE